**UNITED STATES of America,**
**Appellant,**

v.

**Thomas KEPNER and Mary Brown.**

**No. 88–5123.**

United States Court of Appeals,
Third Circuit.

Argued March 15, 1988.

Decided April 1, 1988.

Joseph A. Hayden, Jr. (argued), Alan Silber, Merrill N. Rubin, Paulette L. Pitt, Hayden, Perle & Silber, Hoboken, N.J., for appellee Mary E. Brown.

Edward J. Plaza, Vernon and Aaron, Shrewsbury, N.J., for appellee Thomas F. Kepner.

Paul J. Fishman (argued), Samuel A. Alito, Jr., Edna Ball Axelron, Alicia Olivera Valle, U.S. Attys., Newark, N.J., for appellant.

Before STAPLETON, MANSMANN and HUNTER, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

In this appeal, the United States seeks reversal of two pre-trial orders of the district court suppressing certain physical evidence, as well as live testimony in the prosecution of appellees Thomas Kepner and Mary Brown. Kepner and Brown, along with four co-defendants,[1] were charged in a 32–count indictment with violations of the RICO Act, 18 U.S.C. § 1962(c), (d), and also with the substantive offenses constituting the predicate acts. The district court suppressed various pieces of physical evidence because they were discovered under an overbroad search warrant and because they were not in plain view during the course of the search as authorized by a properly redacted warrant. The court suppressed the testimony under the "fruit of the poisonous tree" doctrine, as the witness whose testimony was suppressed was discovered because of the illegal seizure of physical evidence. Implicit in both of these suppression orders was a finding that the search had not been conducted in good faith reliance on the validity of the search warrant. For the reasons stated below, we reverse both suppression orders.

## BACKGROUND

A. *Factual History*

As part of a continuing investigation into labor racketeering, on April 17, 1986, Special Agent Ronald Chance applied for a warrant to search Unit # 506, Harbor Cove, 550 Bay Avenue, Somers Point, New Jersey ("the condominium"). The application and accompanying affidavit alleged

---

1. Of the six defendants charged in the indictment, only Kepner and Brown had standing to make the suppression motions at issue. Accord-ingly, they are the only defendants who are parties to this appeal.

probable cause to believe that the condominium contained evidence of violations of the Taft–Hartley Act, 29 U.S.C. § 186, and the mail fraud statute, 18 U.S.C. § 1341. Specifically, the affidavit described a scheme whereby money and other benefits were illegally being transmitted to Kepner from CGS, Inc. an employer of members of Local 350 of the International Association of Bridge, Structural, and Ornamental Iron Workers ("Local 350"). Such a scheme is explicitly prohibited by the Taft–Hartley Act. *See* 29 U.S.C. § 186(a)(2), (b)(1).[2]

According to the affidavit, Agent Chance had learned that CGS had paid $130,000 to a consulting firm named Metro Atlantic Corp. Metro Atlantic had in turn paid money to its only three employees, one of them being Mary Brown. Finally, surveillance had shown that Kepner and Brown were frequent companions, spending about five hours a day together at the Harbor Cove condominium. Kepner and Brown had been observed entertaining some of Kepner's relatives at the condominium. Based on these allegations, Agent Chance concluded that a search of the condominium would discover evidence of an illegal relationship between Kepner and Brown, and between the two of them and the companies.

Chance's affidavit read, in relevant part:
24. Further, I have probable cause to believe that such search will result in the seizure of personal items of Kepner such as clothing, documents, records, diaries, and correspondence that establish his use and control of the condominium unit as well as his illegal receipt of the prohibited benefits.

Appendix at 53. The accompanying application form, however, used somewhat broader language, referring merely to the "documents, records and personal effects of Thomas Kepner, Mary Brown, and Robert Brown." Appendix at 43 (Robert Brown was thought to be an alias employed by Kepner). The magistrate discussed each paragraph of the affidavit with Chance before issuing the warrant, but in issuing it, he incorporated the broader language of the application rather than that of the affidavit. *See* Appendix at 41.

Chance led a team of officers in executing the warrant on April 22, 1986. The search team did not have a copy of Chance's affidavit with the warrant, but according to his testimony at the suppression hearing, Chance told the members of the search team that they were to look for evidence showing a relationship between Kepner and Brown or a relationship between the couple and the two companies. Further, Chance instructed the officers to notify him if they found anything which they thought to be covered by the warrant so that Chance could examine it and determine whether it could properly be seized. Appendix at 123.

During the search, Chance found documents relating to the ownership of the condominium. These documents led Chance to believe that Kepner and Brown were residing in an apartment in which Kepner had an illegal joint interest with an employer of Local 350 members. Appendix at 200–01, 221.

Later, while searching through a drawer of Mary Brown's bureau, Chance discovered an envelope addressed to Charles Cornell. The envelope, which had a floral pattern on the back, was addressed:

Mr. Charles Cornell
935 Ocean Avenue
#419
Ocean City, New Jersey 08226

The postmark on the envelope was dated June 23, 1980. Inside this envelope was another envelope, with the same floral pattern, addressed to "Mary and Tom"; this second envelope contained a handwritten note from Brown's mother, which was signed "Love Always, Mom." Appendix at 408–12. Chance knew that Cornell was the head of a steel company employing members of Local 350. Having already come to suspect an illegal joint interest in one apartment, Chance decided to open the envelope and seize it and the documents en-

---

**2.** The affidavit also alleged that, according to a confidential informant, Kepner had a financial interest in CGS, Inc. Such an interest would be in violation of the Taft–Hartley Act.

closed as evidence of a similar Taft–Hartley violation. Appendix at 218–21.

About a year after the search of the condominium, a Labor Department agent went to the address on the envelope bearing Cornell's name. The agent learned that Cornell had rented the apartment. Later still, on June 4, 1987, Chance went to interview Cornell and serve him with a grand jury subpoena. Cornell asked about his status, and Chance responded that he was not a target of the investigation. Cornell, who said he had already learned of the investigation from a union official, asked if the investigation concerned the "Christmas collection." Chance answered that the investigation related to payoffs to Kepner "both in the form of cash and by providing free services for him, namely providing free condos or apartments for Kepner's girlfriend." Appendix at 414. Cornell did not respond to this, but as Chance was leaving, Cornell remarked: "So, he's going to ask me about the apartment." Cornell provided little information during the interview, and indicated that he might invoke his right to silence before the grand jury. At no time during the interview did Chance mention the envelope found in the condominium, nor did he show it to Cornell.

Cornell testified before the grand jury on June 10, 1987. After being informed of his constitutional rights, Cornell did not invoke his right to remain silent. Instead, he admitted that he had provided a rent-free apartment to Kepner and Brown between 1979 and 1981. He stated that Kepner had in 1979 asked Cornell to rent an apartment for Brown, and that he had done so, paying approximately $16,000 in rent over a three-year period. He also stated that Kepner never reimbursed him for the rent, and he also identified his own signature on copies of the apartment leases. As a result of this testimony, one of the predicate acts charged in the RICO counts of the indictment against Kepner and Brown was their receipt of the free apartment in violation of the Taft–Hartley Act.

## B. *Procedural History*

Kepner and Brown were charged in a 32–count indictment with racketeering and conspiracy to commit racketeering, 18 U.S.C. § 1962(c), (d). Specifically, the indictment alleged a conspiracy to conduct the affairs of Local 350 through a pattern of violations of the Taft–Hartley Act, 29 U.S.C. § 186, in which various employers of Local 350 members made illegal payments to Kepner, who was the union's treasurer. In addition, the indictment alleged the obstruction of justice by various defendants, and also included counts charging substantive offenses through the commission of the acts predicate to the RICO counts.

On November 18, 1987, Kepner and Brown moved to suppress evidence seized pursuant to the warrant authorizing the search of the condominium. The warrant had authorized a search for the records of two companies, Metro Atlantic Corp. and CGS, Inc., as well as the "documents, records, and personal effects of Thomas Kepner, Mary Brown and Robert Brown." Appendix at 41. On December 28, 1987, the district court ruled that the warrant was overbroad, and redacted the warrant to exclude the language quoted above. Appendix at 55–97. During a colloquy following this ruling, counsel for the Government indicated that it might want to appeal. Appendix at 67.

Following this ruling, the court held hearings to determine whether specific pieces of evidence seized at the condominium should be suppressed. By order dated January 28, 1988, the court ruled that certain pieces of evidence had been properly seized under the redacted warrant. Certain other pieces of evidence, although outside the scope of the redacted warrant, were held to have been properly seized as being in plain view during the properly conducted portions of the search. Finally, the court suppressed certain items as being neither within the scope of the redacted warrant nor in plain view at the time of the search. One of the items suppressed in this order was Exhibit 406, the envelope addressed to Cornell found in a drawer of Mary Brown's bureau. Following the announcement of this ruling in open court on January 26, 1988, counsel for the Government stated: "I can advise the court now

that there will be no appeal pre-trial. And we will be proceeding to trial next Monday." Supplemental Appendix at 29.

Based on the suppression order of January 28, Kepner and Brown moved to suppress the testimony of Charles Cornell under the "fruit of the poisonous tree" doctrine, on the grounds that it was tainted by the illegal seizure of Exhibit 406. The court granted the motion on February 11, 1988.

The Government filed a timely notice of appeal as to both suppression orders on February 16, 1988. This court has jurisdiction over such an appeal because at the time of the orders, a jury had not yet been sworn, and therefore jeopardy had not yet attached.[3] See 18 U.S.C. § 3731. The Government also moved for a stay of trial pending the appeal. On February 17, 1988, the district court granted a stay as to the first two counts of the indictment (the RICO counts) but denied it as to all other counts. Appendix at 483–94. The Government filed an emergency motion with this court to stay the entire trial pending disposition of this appeal on February 19, 1988. On February 22, 1988, a panel of this court granted the motion and ordered this appeal on the merits to proceed on an expedited basis.

### DISCUSSION

In this appeal, the Government seeks primarily to reverse the suppression of Cornell's testimony at trial, and the briefs of both parties are addressed to that issue. However, as the notice of appeal indicates, both of the district court's suppression orders have been challenged. In its brief, the Government contends that if this court reverses the suppression of Cornell's testimony because the search warrant was not overbroad, or because the search was conducted in good faith, that the suppression of any evidence discovered in the search of the condominium would have to be reversed. This position has some merit, but is complicated by the fact that the Govern-

ment has apparently conceded the overbreadth of the warrant with respect to the personal effects of Mary Brown, and also by the fact that the district court never explicitly ruled on the issue of good faith. Accordingly, the following analysis focuses on the suppression of Cornell's testimony, but also addresses the effect of the reasoning upon the suppression of other evidence.

### I. Jurisdictional and Prudential Concerns

As an initial matter, Kepner and Brown assert that this court should not consider the merits of this appeal for two reasons. First, they claim that the Government should be judicially estopped from appealing all or part of the suppression of evidence because of its representation in court on January 26, 1988, that it would not appeal the suppression of physical evidence which the court had just announced. Second, they argue that the district court made a prospective finding of fact, reviewable only for clear error, that should the Government appeal anything more than the suppression of Cornell's testimony, such an appeal would be for purposes of delay. Since the Government does not limit its appeal to Cornell's testimony, and since this court's jurisdiction under 18 U.S.C. § 3731 requires that this appeal not be for purposes of delay, Kepner and Brown argue that this court lacks jurisdiction. We reject both arguments.

### A. Judicial Estoppel

■ The argument that the Government should somehow be estopped from raising this appeal is totally without merit. As to the main issue of Cornell's testimony, the Government simply never suggested that it would not appeal an adverse ruling. At the time the Assistant United States Attorney told the court that it would not appeal the suppression of the physical evidence, the taint hearing concerning Cornell's testimony had not yet begun. Even if the Government could be estopped from ap-

---

**3.** During the pendency of the motion to suppress Cornell's testimony, the district court had also conducted jury selection for this case. On February 11, a compete jury had been selected but not sworn.

pealing the first suppression order, there is no basis for this court to hold that a promise not to appeal one pre-trial order can have prospective force prohibiting the appeal of any subsequent pre-trial order.

As to the appeal of the first suppression order, there are at least two reasons why the Government should not be estopped. First, the decision to suppress Cornell's testimony necessarily relies on the validity of the earlier suppression ruling. There are a number of reasons why this court could reverse the suppression of the testimony, and some of them necessarily implicate the suppression of other evidence. Given that both suppression orders have been appealed, it would be nonsensical for this court to rule on the one hand that Cornell must be allowed to testify because the search which led to his discovery was conducted in good faith, and yet on the other hand to affirm the suppression of other evidence seized with the same good faith. Second, the cases cited by Kepner and Brown all involve the use of estoppel where a party either has raised inconsistent legal positions or pursued a separate legal claim that he had already represented he would not litigate. Neither type of case is analogous to the current appeal.

▮ Making a statement about the intent to appeal a decision is not the same as taking a position on a legal matter. A party who has gained an advantage by characterizing the law or facts involved in a case should not later be able to contradict that characterization in order to obtain a further advantage. *See Scarano v. Central Railroad*, 203 F.2d 510, 513 (3d Cir. 1953). But that does not mean that a party cannot change its position about what it intends to argue in the future, especially if the full implications of the decision are not yet known at the time of the statement. That is precisely what happened in this case. The Government apparently decided that it would not be worthwhile to challenge the first suppression order; accordingly, it told the court that there would be no appeal. When the court later ruled that Cornell's testimony would also be suppressed, the stakes had changed, apparent-

ly to the point where the Government felt it could no longer forego a challenge.

Kepner and Brown place great emphasis on the Government's failure to state that it might appeal an adverse ruling on the motion to suppress the testimony. However, they have not provided any authority showing that a party can only appeal a ruling if it has previously warned its adversary that it might do so. Finally, as Kepner and Brown admit in their brief, the Government warned the court that it might appeal an adverse suppression ruling when the ruling on the warrant's overbreadth was announced. *See* Appendix at 67. If, as Kepner and Brown argue, the Government must be bound to the first statement it made about its plans to appeal, then there is no basis for estopping the Government in this case.

Finally, Kepner and Brown advance a theory that by pursuing this appeal, the Government is breaching a "bargain" it struck with the district court. In support of this theory, they cite *Patriot Cinemas, Inc. v. General Cinema Corp.*, 834 F.2d 208 (1st Cir.1987). Leaving aside other dissimilarities between *Patriot Cinemas* and the current appeal, an overriding difference between the two cases is that in the former, the "bargain" involved a promise not to file a separate legal claim, while in this case the Government allegedly bargained with the district court not to appeal that court's ruling.

*Patriot Cinemas, supra,* involved a party to a civil action which, in opposing a stay of proceedings in a state court action pending the outcome of an appeal on a related matter in federal court, promised the state court that it would not pursue yet another related claim in the state court. Whatever the merits of binding a party to a promise not to pursue a viable legal claim, the situation in that case can have no bearing on a statement by the Government that it will not continue to pursue the *same* claim that is before a given court by taking an appeal if it is dissatisfied with that court's decision. For all of these reasons then, the Government is not estopped from appealing

any part of the suppression orders entered by the district court.

## B. *Jurisdiction*

The challenge to this court's jurisdiction over the current appeal is meritless. The jurisdictional statute reads, in pertinent part:

> An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence ... in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

18 U.S.C. § 3731.

■ Each of the jurisdictional prerequisites has been met. The two orders from which the Government appeals both suppress evidence, and both were made before the defendants were put in jeopardy and before a verdict was rendered on the indictment. The United States attorney has made the required certification to the district court. This court need look no further in order to determine the existence of jurisdiction.

Kepner and Brown premise their jurisdictional argument on a statement made by the district court: "In light of the government's most recent affirmation that it does not seek appeal of the January 28 suppression order, an attempt to extend the appeal to encompass that order would clearly be for the purposes of delaying these proceedings." Appendix at 494. They characterize this statement as a prospective finding of fact, reviewable only for clear error. *See* Appellant's Brief at 20–21.

There are two problems with this argument. First, as already noted, the jurisdictional requirements prescribed by Congress have been satisfied. Even if the district court had found unconditionally that the appeal was intended solely to delay the proceedings, this court would nevertheless have jurisdiction. The district court could, of course, refuse to stay the proceedings pending the outcome of the appeal; it could also take appropriate action should it find the appeal to be frivolous or dilatory. But once jurisdiction has vested in this court, as it has in this case, it cannot be divested by a district court's finding as to the purpose of the appeal.

■ The second problem with the jurisdictional argument is that the district court was not even attempting to place a condition on the appellate jurisdiction in this case. The comment quoted above was made in the context of a hearing to determine whether the district court would stay the trial pending the outcome of this appeal. The court decided to stay trial on two of the 32 counts in the indictment, and proceed on the others. This court has already reviewed the ruling on the stay, and determined that the entire trial must be stayed pending the present ruling. There is thus no basis for further review by this court of the district court's comment about the purpose of the Government's appeal.[4] Having determined that this court can and should reach the merits of this appeal, we now turn to them.

## II. *The Search Warrant*

The district court issued its first suppression order in this case based on an earlier decision that the warrant for the search of the condominium was overbroad. The court seems also to have been concerned that there was no probable cause to believe that Kepner's documents, records, and personal effects would be found in the condominium or that they would be evidence of a

---

**4.** Even if this court were to engage in the kind of review Kepner and Brown urge, we would still assert jurisdiction. As already noted, an appeal of the suppression of testimony under the "fruit of the poisonous tree" doctrine necessarily involves a determination as to whether the tree was poisonous. Since this court would have to consider the reasons for suppressing the physical evidence in order to rule on the suppression of Cornell's testimony, it is not dilatory for the Government to ask us to rule on the suppression of the physical evidence as well.

crime. Given the nature of the crime the Government was investigating, and the theory under which they suspected Kepner of criminality, we hold that the search warrant was both supported by probable cause and sufficiently particularized for purposes of the Fourth Amendment.[5]

## A. *Probable Cause*

Any discussion of probable cause must begin with the standard set in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In *Gates*, the Supreme Court addressed not only the task of the magistrate in determining the existence of probable cause, but also the role of the courts in later reviewing that determination:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed.

*Id.* at 238–39, 103 S.Ct. at 2332 (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)); *see also, United States v. Tehfe*, 722 F.2d 1114, 1117 (3d Cir.1983), *cert. denied*, 466 U.S. 904, 104 S.Ct. 1679, 80 L.Ed.2d 154 (1984).

■ In this case, the magistrate had before him an affidavit showing that Kepner had been observed to be spending a significant amount of time in the condominium on a regular basis. The allegations in the affidavit supported the Government's belief that a search would discover evidence that Kepner was illegally receiving benefits from an employer of members of Local 350. Accordingly, the magistrate issued a warrant because a common-sense interpretation of the affidavit provided a substantial basis for concluding that probable cause

existed. Under the rule of *Gates*, this is the extent of the allowable review of probable cause. To the extent that the district court seems to have substituted its own *de novo* interpretation of the affidavit for that of the magistrate, it was in error. *See e.g.*, Appendix at 72 ("And my ruling simply suggests that from everything I read[, the condominium] is a place of entertainment and certainly not a place of crime.").

## B. *Particularity*

Given the existence of probable cause to search for evidence of Kepner's illegal receipt of benefits, the remaining question with regard to the warrant is whether it was drawn with sufficient particularity. The district court seems to have been troubled primarily by the fact that the language of the warrant was broader than that of the affidavit. Whereas the affidavit anticipated the seizure of "clothing, documents, records, diaries, and correspondence that establish [Kepner's] use and control of the condominium unit as well as his illegal receipt of prohibited benefits," Appendix at 53, the search warrant authorized a search for the "documents, records and personal effects of Thomas Kepner." Appendix at 41.

The district court concluded that because the language of the warrant was broader than that of the affidavit, and because the officers executing the warrant did not have a copy of the affidavit with them, that the warrant was overbroad. We disagree. It is true that the warrant uses broader language than the affidavit, but given the nature of the Government's investigation, both documents describe the same category of evidence. Because the Taft–Hartley Act makes it illegal for a union official to receive benefits from an employer either directly or indirectly, any evidence of Kepner's presence in the condominium on a regular basis could be evidence of a violation of the statute.

---

5. Since the Government has conceded that the warrant was overbroad with respect to the search of Mary Brown's personal effects, our holding as to particularity applies only to portion of the warrant authorizing a search for Kepner's documents, records, and personal effects. This limitation on our holding, however, does not affect the outcome of this appeal for reasons stated below in Part III.

■ More to the point, any documents, records or personal effects of Kepner's found in the condominium could support the Government's position that Kepner was receiving benefits prohibited by the Taft–Hartley Act. Under this theory, which was explained to the magistrate issuing the warrant, the language of the warrant allowed for no broader a search than that of the affidavit. As this court has stated quite recently: "When an entire, discrete body of evidence is described, the naming of every component of that body is mere surplusage." *In re Impounded Case (Law Firm)*, 840 F.2d 196, 201 (3d Cir.1988). We do not see how the more precise language of the affidavit would have limited the scope of the search authorized by the magistrate.

■ The district court did not rule as to whether the words of the affidavit, if incorporated into the warrant, would have provided sufficient particularity. However, as noted above, those words would constitute mere surplusage given the context of the Government's investigation. We therefore hold that, even without the more specific language of the affidavit, the warrant authorizing the search of Kepner's documents, records, and personal effects was sufficiently particularized for purposes of the Fourth Amendment.[6]

### III. *Good Faith Reliance on the Warrant*

Despite the fact that the issue was raised several times in the suppression proceedings, the district court never explicitly ruled on the issue of good faith. In deciding to suppress Cornell's testimony, however, the district court necessarily decided that the condominium was not searched in good faith. In order to decide that the

testimony was tainted by the illegal seizure of the envelope bearing Cornell's name, the court had to conclude that the envelope was illegally seized. And despite its finding that the search warrant was overbroad, and the later finding that the portion of the envelope which led the Government to seek out Cornell was not in plain view, the seizure of that envelope would not have been illegal if it had been done in good faith reliance on the validity of the warrant. Therefore, the district court could only suppress Cornell's testimony after deciding the issue of good faith adversely to the Government. This implicit ruling must be reversed.

Two cases decided the same day by the Supreme Court control our analysis of this issue. In *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Court held that evidence seized in good faith reliance on the validity of a warrant later determined to be defective should in some cases be admitted. In *Massachusetts v. Sheppard*, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), the companion case to *Leon*, the Court applied this good faith doctrine to the case where a warrant had been invalidated because it was overbroad.

In the present case, as in *Sheppard*, the officer who swore out an affidavit, secured a search warrant, and conducted the search "took every step that could reasonably be expected of [him]." 468 U.S. at 989, 104 S.Ct. at 3428. Special Agent Chance discussed his affidavit in detail with the magistrate, and conducted the search so as to ensure that the only items seized would be those described by the affidavit and approved by the magistrate. He had reason to believe that every item covered by the warrant could legally be seized. Moreover, while the team searching the condominium

---

**6.** The Government has conceded the overbreadth of the warrant with respect to the personal effects of Mary Brown. However, we see no reason why a subsequent concession by the Government, which may have been made for strategic or logistical reasons, should relate back to the time of the search in deciding the issue of good faith. We certainly are not bound by the Government's concession in deciding whether Mary Brown's effects should be suppressed. However, because the avenue by

which we choose to resolve this matter does not require us to determine the overbreadth issue with respect to Mary Brown, we make no comment about its validity. At any rate, because we hold that all the evidence suppressed by the district court is admissible for other reasons, there will be no need for the district court to determine which pieces of evidence were seized as the personal effects of Mary Brown, and which pieces were seized under the other portions of the warrant.

did not have with them a copy of the affidavit, the record reveals that the team was led by Special Agent Chance, who had drawn up the affidavit; that Chance had carefully instructed his search team as to the scope of their search; and that he took responsibility for determining whether every piece of seized evidence fell within the scope of the warrant. Given Chance's intimate familiarity with the investigation and the purpose of the search, as well as the fact that he had carefully discussed the scope of the search with the magistrate, it seems quite unlikely that there was any confusion as to what evidence the warrant allowed to be searched and seized.

Despite the Government's concession as to the overbreadth of the warrant with respect to the personal effects of Mary Brown, there has been no concession that the warrant was so obviously overbroad that a reasonable officer executing it would recognize its invalidity. To the contrary, Special Agent Chance had discussed the scope of his proposed search with the magistrate, and reasonably assumed it to be valid. Thus, to the extent that the warrant in this case was overbroad as to Mary Brown, it was not obviously so; Special Agent Chance had every right to assume that the warrant was valid. And since the record shows that the search was conducted with great care so as not to exceed the perceived scope of the warrant, there is no

basis for a finding of bad faith in the execution of the warrant.[7]

 We therefore hold that the evidence discovered during the search of the condominium was seized in good faith reliance on the validity of the warrant, and is therefore admissible. Since the seized evidence is admissible, the testimony derived from that evidence is necessarily admissible as well.[8]

## CONCLUSION

"As with any remedial device, application of the [exclusionary] rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974). Excluding Cornell's testimony in this case does little to serve the purpose of deterring police misconduct. Whether because the warrant was valid, or because it was executed in good faith, allowing the testimony in this case is not likely to encourage future misconduct by the police. In this case, the Government investigator submitted an affidavit of probable cause to a magistrate, discussed it in detail, and obtained a search warrant. In executing that warrant, he carefully ensured that only items which he thought to be within its scope were seized. It is inconceivable that the admission of the evidence seized

---

7. Because we are concerned with the precedential effect of holding this warrant to have been executed in good faith, we note the limited nature of our decision. In the usual case, a warrant authorizing a search of the documents, records, and personal effects of a named individual could make the executing officer suspicious of the warrant's validity. In the current case, however, there are two reasons for holding that the search was executed in good faith. First, the nature of the offense which the Government was investigating necessarily called for an unusually broad search, which would tend to make a reasonable officer less suspicious of the wording of the warrant as issued. Second, the careful procedure followed by Special Agent Chance is particularly relevant and after his paragraph-by-paragraph discussion with the magistrate, fully supports the good faith here noted. Any possible doubt of Chance's would have been quelled at the outset by the affirmative assurance of the magistrate. *See Leon*, 468 U.S. at 921, 104 S.Ct. at 3419.

8. Our holding on the issue of good faith obviates the need to decide the remaining issues raised on appeal. We note, however, that the record supports the Government's position that even if the Cornell envelope and the envelope labeled "Mary and Tom" were not within the scope of a properly redacted search warrant or seized in good faith reliance on the validity of the warrant, they would still have been in plain view during the course of a properly conducted search. While the Government has conceded that there was not probable cause to *seize* the envelopes based on a plain view theory, the facts that the search team could properly have seen the inner envelope in plain view and that seeing that envelope would have prompted them to seek out Cornell as a witness, further justifies the admission of Cornell's testimony. *See Arizona v. Hicks*, —— U.S. ——, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

by this process will encourage future misconduct. For this reason, as well as for the reasons stated above, this court will reverse the suppression orders entered by the district court.