913 P.2d 39

**STATE of Hawai'i, Respondent–Appellee,**

v.

**Melanie L. NAVAS, Petitioner–Appellant.**

No. 16695.

Supreme Court of Hawai'i.

Feb. 26, 1996.

As Amended March 19, 1996.

Theodore Y.H. Chinn, Deputy Public Defender, on the briefs, Honolulu, for petitioner-appellant, on the writ.

James M. Anderson, Deputy Prosecuting Attorney, on the briefs, Honolulu, for respondent-appellee, on the brief.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

RAMIL, Justice.

█ We granted a writ of certiorari to review the decision of the Intermediate Court of Appeals (ICA) in *State v. Navas*, 81 Hawai'i 29, 911 P.2d 1101 (App.1995) [hereinafter *Navas I*], specifically to address the proper standard of review to apply when reviewing a magistrate's[1] determination of probable cause to issue a search warrant.

## I. FACTS

The following are the facts as provided in *Navas I*.

On October 7, 1991, the Narcotics Division of the Honolulu Police Department (HPD) received a tip from an anonymous caller that Edward, who lived at 151 Circle Drive, Wahiāwā, and worked as a prison guard with the rank of sergeant at the Halawa Correctional Facility (HCF), was selling crystal methamphetamine at the Stadium Mall, Pacheco Park, and the Wahiāwā Cornet Store. The anonymous caller stated Edward's residential and car telephone numbers and alleged that Edward conducted his crystal methamphetamine business through the car telephone. By October 30, 1991, HPD had verified that Edward lived at 151 Circle Drive, was employed at the HCF with the rank of sergeant, and his telephone numbers were unlisted. HPD also learned that Edward had been arrested a total of seven times during the period from 1971 through 1989: once in 1971 for a narcotics offense, once for Abuse of a Family Member, three times for traffic offenses, and twice for contempt of court.

On October 30, 1991, at approximately 3:00 p.m., Roberts telephoned Edward's residence. Roberts asked to speak to "Ed Navas." The adult male who answered affirmed that he was "Ed." Roberts identified himself as "Joe." Roberts inquired about buying "ice," a vernacular for crystal methamphetamine. In response, Edward asked how Roberts knew him. Roberts explained that he met Edward through a friend named "Clarence" when Edward sold them "ice" by the Wahiāwā Cornet Store. Edward then asked Roberts how much "ice" he wanted. Roberts replied $100 worth. Edward asked that "it would be no problem," and suggested that they "meet someplace and [Edward] would take

---

**1.** The term "magistrate" is generically used in HRS § 803–31 to refer to a judicial officer who makes a determination of probable cause to issue a search warrant. HRS § 803–31 provides in relevant part:

**Search warrant; defined.** A search warrant is an order in writing made by a *judge or other magistrate ...*

(Emphasis added.)

Accordingly, the term "magistrate" is used in the text of this opinion to refer to any state court judge who makes a determination of probable cause to issue a search warrant.

care of [Roberts]." Roberts informed Edward that he worked at the Navy Commissary cafeteria as a cook and that he was not able to leave but would check with his boss. Roberts gave Edward the HPD covert telephone number, and Edward said he would call back in ten minutes.

At approximately 3:15 p.m., Edward called back and Roberts informed him that he could not leave work until 9:00 p.m. Roberts suggested that his "girlfriend" could meet with Edward to "pick up the 'ice.'" Edward agreed and said that he had to go to town first and would try to call back at about 5:30 p.m. However, Edward did not call.

At approximately 9:00 p.m., Roberts called Edward and reminded him that he had $100 and wanted to buy some "ice." Edward suggested they meet in the First Hawaiian Bank parking lot in Wahiāwā. Edward asked what would be a good time to meet. When Roberts responded "9:30 p.m.," Edward agreed. The police observed Edward drive directly from his house to the First Hawaiian Bank parking lot.

At approximately 9:35 p.m., Roberts pulled into the First Hawaiian Bank parking lot. He saw a red 1977 Buick, bearing the license plate number AEJ–239, and was aware that Edward was its registered owner. The male sitting in the red Buick matched Edward's physical description. Upon greeting each other, Roberts recognized the voice as the one he had heard on the telephone during their previous conversations. Roberts observed a mobile telephone mounted on the center console of the red Buick. After a lengthy discussion on how Roberts knew Edward, Edward said that "he didn't deal with strangers and he did not know what [Roberts] was talking about." When asked why he had come to meet Roberts, Edward responded that "he just wanted to check [Roberts] out." Edward drove out of the lot at approximately 9:40 p.m. Edward did not meet with anyone before he arrived home. He used an indirect route to get there, utilizing side streets and routes through densely populated areas.

The next day, Officer Roberts viewed a photographic line-up and positively identified Edward as the suspect in the investigation.

On November 1, 1991, based on Officer Roberts' affidavit, the district court issued a search warrant for the residence owned by Edward and Melanie, and the red Buick owned by Edward. HPD executed the the Search Warrant and seized crystal methamphetamine, marijuana, and drug paraphernalia from Edward's and Melanie's house. An indictment on February 18, 1991, charged Edward [and Melanie] with Count I, Promoting a Dangerous Drug in the Third Degree, Hawai'i Revised Statutes (HRS) § 712–1243 (1985); Count II, Unlawful Use of Drug Paraphernalia, HRS § 329–43.5(a) (Supp.1992); and Count III, Promoting a Detrimental Drug in the Third Degree, HRS § 712–1249 (1985).

*Navas I*, at 31–32, 911 P.2d at 1103–04 (brackets added).

## II. *DISCUSSION*

■ Under the safeguards of the fourth amendment to the United States Constitution[2] and article I, section 7 of the Hawai'i Constitution,[3] all arrests and searches must

2. The fourth amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

3. Article I, section 7 of the Hawai'i Constitution provides:

The right of the people to be *secure in their persons, houses,* papers and effects *against unreasonable searches, seizures and invasions of privacy* shall not be violated; and *no warrants shall issue but upon probable cause,* supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.
(Emphases added.)
The words "invasions of privacy" were added to article I, section 7 by the 1968 Constitutional Convention. *State v. Roy,* 54 Haw. 513, 518, 510 P.2d 1066, 1069 (1973) (Levinson, J.,

be based upon probable cause.[4]

■ Probable cause exists when the facts and circumstances within one's knowledge and of which one has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been committed. *See, e.g., State v. Jerome,* 69 Haw. 132, 134, 736 P.2d 438, 439 (1987). Direct evidence, however, is not necessary for a probable cause determination by the magistrate. *See, e.g., United States v. Angulo-Lopez,* 791 F.2d 1394, 1399 (9th Cir.1986); and *United States v. Wiecking,* 757 F.2d 969, 971 (9th Cir.1983). The issuance of a search warrant is prohibited except upon a finding of probable cause supported by oath or affirmation.

When the magistrate's probable cause determination is appealed, the appellate court must, of course, determine the proper standard of review. Because a disagreement exists among the appellate courts throughout the country as to the appropriate standard of review, we set forth the proper standard for Hawai'i appellate courts to follow when reviewing a magistrate's determination of probable cause to issue a search warrant. Preliminarily, however, it appears both necessary and appropriate that we discuss the standards of review presently used by other jurisdictions.

## A. Standards of Review Used in Other Jurisdictions

The landmark Supreme Court decision, *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), addressed both the definition of probable cause to issue a search warrant[5] and the proper appellate standard of review for a magistrate's probable cause determination. Regarding the appellate court's proper role in evaluating a magistrate's determination of probable cause in warrant cases, the Court stated that "the duty of a reviewing court is simply to ensure that the magistrate had a *'substantial basis* for ... conclud[ing]' that probable cause existed." *Id.* at 238–39, 103 S.Ct. at 2332 (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)) (emphasis added). Furthermore, the Court declared that, in warrant cases, "[a] magistrate's 'determination of probable cause should be paid great deference by reviewing courts,'" and should not be reviewed *de novo. Id.* at 236, 103 S.Ct. at 2331 (quoting *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 591, 21 L.Ed.2d 637 (1969)) (emphasis added). *See also State v. Jones,* 706 P.2d 317 (Alaska 1985); *State v. Decano,* 60 Haw. 205, 213, 588 P.2d 909, 915 (1978); *State v. Kaukani,* 59 Haw. 120, 125, 577 P.2d 335, 339 (1978).

*Gates* rejected *de novo* review because "'[a] grudging or negative attitude by reviewing courts toward warrants' [will tend to

concurring). The Convention's Standing Committee Report No. 55 stated: "The proposed amendment is intended to include protection against ... undue government inquiry into and regulation of those areas of a person's life which is [sic] defined as necessary to insure 'man's individuality and human dignity.'" *Id.* State v. Quino, 74 Haw. 161, 177 n. 1, 840 P.2d 358, 365 n. 1 (1992) (Levinson, J., concurring).

4. Law enforcement officers may conduct warrantless searches. [*Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).] Although warrantless searches are presumptively unreasonable, the Supreme Court recognizes several exceptions to the presumption. One exception is automobiles—law enforcement officers may conduct a warrantless search of an automobile and may subsequently seize contraband, without violating the Fourth Amendment, if such actions are taken upon probable cause. [*See, e.g., State v. Phillips,* 67 Haw. 535, 696 P.2d 346

(1985). *But see State v. Wallace,* 80 Hawai'i 382, 400–401 n. 16, 910 P.2d 695, 713–14 n. 16 (1996)] Another example is exigent circumstances—law enforcement officers may conduct warrantless entry into, and searches of, residences if exigent circumstances exist and there has been a sufficient showing of probable cause. [*See, e.g., State v. Paahana,* 66 Haw. 499, 666 P.2d 592 (1983).] A third exception is where the owner of the property consents to the search. [*See, e.g., State v. Pau'u,* 72 Haw. 505, 824 P.2d 833 (1992).]

Peter J. Kocoras, *The Proper Appellate Standard of Review for Probable Cause to Issue a Search Warrant,* 42 DePaul L.Rev. 1413, 1424–25 (1993) (brackets added and footnotes omitted).

5. In *Gates,* the Supreme Court overruled two prior cases and endorsed a loose "totality-of-the-circumstances" analysis for magistrates to utilize when issuing search warrants. *Id.* at 214, 103 S.Ct. at 2320.

discourage police officers]" and " 'courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner.' " Kocoras, *supra*, at 1430 (citing *Gates*, 462 U.S. at 236, 103 S.Ct. at 2331 (quoting *United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965))) (brackets in original). *See also State v. Sherlock*, 70 Haw. 271, 275, 768 P.2d 1290, 1293 (1989). The Supreme Court further explained:

> If the affidavits submitted by police officers are subjected to the type of scrutiny some courts have deemed appropriate, police might well resort to warrantless searches, with the hope of relying on consent or some other exception to the Warrant Clause that might develop at the time of the search. In addition, the possession of a warrant by officers conducting an arrest or search greatly reduces the perception of unlawful or intrusive police conduct, by assuring "the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search."

*Gates*, 462 U.S. at 236, 103 S.Ct. at 2331 (quoting *United States v. Chadwick*, 433 U.S. 1, 9, 97 S.Ct. 2476, 2482, 53 L.Ed.2d 538 (1977)).

Appellate courts have interpreted *Gates* differently. Some courts apply the "clear error" standard to review probable cause to search in both warrant and warrantless cases, while other courts apply the "substantial basis" standard of review without equating the standard with clear error. Other courts, on the other hand, have implied that probable cause determinations are to be reviewed *de novo*.

### 1. *Clear Error Standard*

The Seventh and Ninth Circuits apply the clear error standard to review a magistrate's determination of probable cause to issue a search warrant. Kocoras, *supra*, at 1432. The Seventh Circuit's position, identical to that of the Ninth Circuit,[6] is discussed at length below.

In *United States v. McKinney*, 919 F.2d 405 (7th Cir.1990), the court held that the proper standard of review was an intermediate standard of review: whether the magistrate had a "substantial basis" for finding that probable cause existed. This decision was later overruled in *United States v. Spears*, 965 F.2d 262 (7th Cir.), *cert. denied*, 506 U.S. 989, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992), where the court held that clear error was the appropriate standard to review probable cause to conduct both warrant and warrantless searches.

In *McKinney*, the defendant-appellant, claiming that there was no probable cause to issue the search warrant and that the trial court erred by upholding the validity of the warrant, argued that the evidence seized on the basis of the search warrant should have been excluded. *McKinney*, 919 F.2d at 408. In affirming the appellant's convictions on all counts, the reviewing court upheld the magistrate's decision to issue the search warrant and held that the applicable standard of review was whether the magistrate had a "substantial basis" for issuing a warrant. *Id.*

First, Judge Flaum, writing for the *McKinney* majority, noted that the Supreme Court had never equated the "substantial basis" standard with the clear error standard, and, thus, appellate courts should not presume the two standards to be the same.

---

**6.** *United States v. Huguez–Ibarra*, 954 F.2d 546, 552 (9th Cir.1992) ("We therefore find that the magistrate's determination that probable cause existed to issue the warrant was clearly erroneous....."); *United States v. McQuisten*, 795 F.2d 858, 861 (9th Cir.1986) ("We may not reverse a magistrate's finding of probable cause unless it is clearly erroneous."); *United States v. Stanert*, 762 F.2d 775, 779 (9th Cir.1985) ("We may not reverse such a conclusion [that probable cause existed] unless the magistrate's decision is clearly erroneous."); *United States v. Estrada*, 733 F.2d 683, 684 (9th Cir.1984) ("We may not reverse [a

magistrate's determination of probable cause] unless it is clearly erroneous.").

> The case relied upon by the above decisions as establishing the use of the [clear error] standard, *United States v. Seybold*, 726 F.2d 502 (9th Cir.1984), does not include any discussion of the clearly erroneous standard of review in these situations.

Peter J. Kocoras, *The Proper Appellate Standard of Review for Probable Cause to Issue a Search Warrant*, 42 DePaul L.Rev. 1413, 1432 n. 140 (1993).

*Id.* at 409. Second, Judge Flaum observed that Seventh Circuit precedent had always used an intermediate standard for reviewing probable cause determinations and concluded that such a standard was more appropriate than the more deferential clear error standard because constitutional rights were at issue in these cases. *Id.* at 412.

Judge Posner filed a concurring opinion but asserted that, in his view, the appropriate standard of review is the clear error standard. *Id.* at 418–19. Citing *Mars Steel Corp. v. Continental Bank, N.A.,* 880 F.2d 928, 933 (7th Cir.1989) (en banc), and *Foy v. First National Bank,* 868 F.2d 251, 254 (7th Cir.1989), he noted that the application of law to fact is a question of fact for purposes of appellate review and, thus, should be reviewed under the clear error standard. *McKinney,* 919 F.2d at 419. Judge Posner also noted that the dramatic increases in workloads for appellate courts necessitated a deferential standard of review. *Id.* at 420. Moreover, because *Gates* did not state that substantial basis was to be an intermediate standard of review, *Gates* did not preclude the use of a clearly erroneous standard of review. *Id.* at 421–22. Furthermore, Judge Posner contended that less appellate scrutiny was appropriate in warrant cases because "[t]he trier of fact ... is closer to the facts than the appellate judges and is therefore better able, other things being equal, to assess their legal significance." *Id.* at 419.

Judge Will filed a concurring opinion in support of the substantial basis standard of review as an intermediate standard. In his view, a higher degree of scrutiny is required because "[p]robable cause is a constitutionally mandated standard." *Id.* at 424. Judge

Will further stated that "[t]he difference between the substantial basis standard and a clearly erroneous standard of review is significant[,]" that the distinction was more than semantic, and that cases will be decided differently depending on what standard is used.[7] *Id.* at 425. Judge Will also refuted Judge Posner's assertion that appellate judges were further removed from the facts and less able to assess their legal significance than the magistrate and thus should review such issuances with less scrutiny.[8] *Id.*

Subsequently, the court in *Spears* apparently agreed with Judge Posner's reasoning and overruled *McKinney.* The defendant in *Spears* was charged with conspiracy to distribute cocaine, distribution of cocaine, and possession with intent to distribute. *Spears,* 965 F.2d at 268. He sought to suppress evidence seized from his car, alleging that the police officers did not have probable cause, a warrant, or consent to search. *Id.* Upon the district court's denial of the motion to suppress, the defendant appealed to the Seventh Circuit, arguing that the court erred in denying the motion to suppress. *Id.*

In overruling *McKinney,* the Seventh Circuit held that the proper standard of appellate review was clear error in *both* warrant and warrantless cases. *Id.* at 270–71. Relying on the Supreme Court's decisions in *Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984), and *Gates,* the Seventh Circuit stated that these decisions required "plain and simple" factual review that should be conducted under the clear error standard. *Spears,* 965 F.2d at 270. The *Spears* opinion therefore adopted a single standard of review, clear error, for all searches. Upon applying this standard, the

---

7. Judge Will explained:

[T]here is at least a psychological (and accordingly, in practice, a quite real) difference between saying (a) that we will reverse only if the decision below is clearly erroneous and (b) that we will affirm, if, giving deference to the lower court's determination, that determination has a substantial basis. The first formulation amounts to a recipe for almost routine affirmance. The second, by contrast, ensures a more detailed and searching review than a clear error standard does and is the appropriate and correct standard for reviewing constitutional determinations. There *are* cases that

will be decided differently, and the fourth amendment protection will be different, depending on whether a "substantial basis" or a "clearly erroneous" standard is used.

*Id.* at 425 (emphasis in original).

8. According to Judge Will, appellate judges are just as capable as magistrates of assessing the facts because almost all of the facts relied upon by the magistrate will be contained within the four corners of the supporting affidavit, which is equally available to the appellate court. Moreover, no substantial record is developed during warrant hearings. *Id.*

court concluded that the magistrate was not clearly erroneous in determining that the agents had probable cause to conduct the search of the defendant's car. *Id.* at 272.

Thus, for policy reasons discussed above,[9] some jurisdictions, such as the Seventh Circuit, have adopted the clear error standard for appellate review of a magistrate's probable cause determination in the search warrant context, which is considered by these jurisdictions as equivalent to the substantial basis language of *Gates.*

### 2. *Substantial Basis Standard*

The First, Second, Third, Fourth, Fifth, Sixth, Eighth, Tenth, Eleventh, and District of Columbia Circuit Courts of Appeal apply the substantial basis standard when reviewing a magistrate's determination of probable cause to issue a search warrant, and do so without equating the standard with clear error. Kocoras, *supra,* at 1437–38. These jurisdictions rely on the language in *Gates* and subsequent Supreme Court decisions that repeatedly employ the "substantial basis" standard without ever equating it with the clear error standard, and do not elaborate further on the appropriate standard.

*United States v. Kepner,* 843 F.2d 755 (3d Cir.1988), presents a typical example of the application of the substantial basis review. In *Kepner,* an affidavit submitted by a special agent was used to obtain a search warrant for the condominium of the defendant Kepner. *Id.* at 756–57. The affidavit specifically described a scheme whereby money and other benefits were illegally being transmitted to Kepner from CGS, Inc., an employer of members of Local 350 of the International Association of Bridge, Structural, and Ornamental Iron Workers (Local 350).[10] Furthermore, the affidavit stated that the special agent had learned that CGS had paid $130,-000 to a consulting firm named Metro Atlantic Corp., which had in turn paid money to its only three employees, one of them being

defendant Mary Brown. *Id.* at 757. Finally, the affidavit described surveillance reports of meetings between Kepner and Brown, who often spent about five hours a day together at the condominium. *Id.* The agent concluded that a search of the condominium would reveal items such as documents, records, and personal effects that would establish Kepner's use and control of the condominium unit as well as his illegal receipt of the prohibited benefits. *Id.*

Kepner and Brown were charged in a thirty-two count indictment with racketeering and conspiracy to commit racketeering. *Id.* at 758. They moved to suppress evidence seized pursuant to the warrant authorizing the search of the condominium. *Id.* The district court held that the warrant was overbroad and conducted hearings to determine whether specific pieces of evidence should be suppressed. *Id.* The government appealed to the Third Circuit, arguing that the search was conducted with probable cause and that the warrant was drawn with sufficient particularity. *Id.* at 762.

The Third Circuit held that any discussion of probable cause must begin with the standard set in *Gates, i.e.,* that the "duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for … conclud[ing]' that probable cause existed." *Kepner,* 843 F.2d at 762. For this reason, the Third Circuit concluded that it was erroneous for the district court to substitute its own *de novo* interpretation of the affidavit for that of the magistrate. *Id.* In reversing the suppression orders entered by the district court, *id.* at 765, the Third Circuit held that, because the allegations in the affidavit supported the government's belief that a search would discover evidence that Kepner was illegally receiving benefits from an employer of members of Local 350, "a common sense interpretation of the affidavit provided a *substantial basis* for concluding that proba-

---

9. In addition to the policy reasons discussed *supra,* by applying clear error, "the appellate court is relieved of the burden of a complete and independent evidentiary review, thereby enabling appellate judges to devote more of their time and energy to reviewing questions of law." Kocoras, *supra,* at 1417.

10. Such a scheme is explicitly prohibited by the Taft–Hartley Act. *Kepner,* 843 F.2d at 757 (citing 29 U.S.C. §§ 186(a)(2) and (b)(1)).

ble cause existed." *Id.* at 762 (emphasis added).

Despite ten circuits using the substantial basis standard without equating it with the clear error standard, adoption of this standard would create potential confusion for Hawai'i reviewing courts.

The Supreme Court in *Gates* stated that such determinations "should be paid great deference by reviewing courts." The amount of deference to be accorded to magistrate determinations in warrant cases under an intermediate standard of appellate review is unclear. *Gates* does not answer this question, and it is unlikely that an intermediate standard of appellate review, between clearly erroneous and de novo, would consist of "great deference." Moreover, if by using the words "substantial basis" the Supreme Court meant only that such a standard of review would encompass more deference than de novo, then the words "great deference" should not have been used in describing the standard.

As mentioned earlier, the adoption of substantial basis as an independent standard of appellate review creates not merely a derivative standard, but an entirely new one. In his concurring opinion in *McKinney*, Judge Posner described such a scheme as "confusing, unworkable, and unnecessary." This description appears to have merit since the substantial basis standard of appellate review is to be composed of "great deference," yet is also to be less deferential than the clearly erroneous standard of appellate review. The task of describing the precise contours of such a standard is indeed difficult.... The use of substantial basis as an intermediate standard of appellate review in warrant cases adds further complexity to appellate review and would do little to change the result of most cases.

Kocoras, *supra,* at 1456–57.

### 3. *De Novo Standard*

Despite the federal circuit courts' general use of a "clear error" or "substantial basis" standard of review when reviewing a magistrate's determination of probable cause to issue a search warrant, a number of decisions, such as *United States v. Malin,* 908 F.2d 163, 165 (7th Cir.1990), and *United States v. Rambis,* 686 F.2d 620, 622 (7th Cir.1982), imply that probable cause determinations, by whomever made, are to be reviewed *de novo, i.e.,* as if the reviewing court is the front-line judicial authority and, therefore, accord no deference to the lower courts' determinations.

In *Malin,* an affidavit submitted by an Illinois state police special agent was used to obtain a search warrant for the house and adjacent outbuildings of the defendant Malin. *Id.* at 164–65. The affidavit described a surveillance report of six cannabis plants observed from a neighboring yard. *Id.* at 165. The search of Malin's house revealed fifty pounds of marijuana and four handguns, which were seized by law enforcement officers. *Id.*

A jury found Malin guilty of one count of possessing marijuana with intent to distribute, one count of possessing a firearm, and one count of using or carrying a firearm during and in relation to a drug trafficking offense. *Id.* Malin appealed to the Seventh Circuit arguing, *inter alia,* that there was insufficient evidence to establish probable cause to issue a search warrant. *Id.* at 166.

On appeal, the Seventh Circuit impliedly reviewed *de novo:*

Because the probable cause determination "involves the application of law rather than an evaluation of factual evidence ... on review the appellate court is not limited to a determination of whether the district court's finding was clearly erroneous. [*The appellate court] must independently review the sufficiency of the affidavit* [supporting the warrant], recognizing that doubtful cases should be resolved in favor of upholding the warrant."

*Id.* at 165 (quoting *Rambis,* 686 F.2d at 622) (citations omitted) (emphasis added). The Seventh Circuit rejected Malin's argument and held that the agent's observation of marijuana growing in Malin's yard reasonably yielded the conclusion that marijuana or other evidence of marijuana possession would be found in Malin's house. *Id.* at 166. There-

fore, the court held that the evidence presented was sufficient for the issuing judge to find probable cause. *Id.*

In *Rambis,* an affidavit submitted by FBI agents was used to obtain a search warrant for a house of the defendant Rambis. 686 F.2d at 622. The affidavit set forth that Spiro Anast told a government informant that he would set fire to a warehouse using an electronic detonating device that his accomplice would make. *Id.* at 621. Anast told the informant that he was going to meet the defendant, Rambis, the accomplice who was going to make the detonating device, the next day. *Id.* The affidavit further described a surveillance report describing Anast and Rambis meeting at a restaurant, driving to several stores (many of which sold electronic supplies), leaving these stores carrying packages, and Rambis carrying a bag into his house. *Id.* Moreover, the affidavit described a surveillance report reflecting that Anast and a second accomplice, Crovedi, drove to the warehouse and stopped en route to fill a can with gasoline, which they placed in the trunk. *Id.* Lastly, the affidavit described the invoices and owner descriptions, obtained by the special agent, that indicated that Anast and Rambis had purchased four transmitters and twelve pounds of gun powder. *Id.* at 621–22.

The district court held that the affidavit supporting the search warrant did not establish probable cause. *Id.* The government appealed to the Seventh Circuit, arguing, *inter alia,* that there was more than sufficient evidence to establish probable cause and that, in reviewing this finding, the district court did not accord proper deference to the magistrate's determination. *Id.*

On appeal, the Seventh Circuit impliedly reviewed *de novo,* as it later did in *Malin:*

> Whether the information in the affidavit establishes probable cause is a determination based solely on written evidence. Since this determination involves the application of law rather than an evaluation of factual evidence, on review the appellate court is not limited to a determination of whether the district court's finding was clearly erroneous. It must independently review the sufficiency of the affidavit. . . .

*Rambis,* 686 F.2d at 622 (citations omitted). Using this standard, the Seventh Circuit held that there was a very reasonable probability that the items necessary to make the device would be inside Rambis's home, in view of the facts that Rambis was going to make the device, he obviously had been using the home as his residence, at least for a few days, and he would be likely to assemble the device in a workshop or basement. *Id.* at 623.

Although the Seventh Circuit did not explain its reasons for "independently review[ing] the sufficiency of the affidavit" in *Rambis,* and for omitting in *Malin* the "substantial basis" language used in *Gates,* reasons for the court's independent review of the sufficiency of the affidavit may be that:

> [d]e novo review by appellate courts . . . serves important judicial functions. The Supreme Court has recognized that "trial judges often must resolve complicated legal questions without benefit of " 'extended reflection' " or " 'extensive information.' " There are several reasons for this. [Magistrates], who preside over "fast-paced" trials, necessarily must devote most of their energy and resources to hearing witnesses and reviewing evidence. Furthermore, trial counsel is limited in its ability to assist the legal research of district judges with memoranda and briefs because of the time pressures surrounding a trial. On the other hand, [appellate courts] are in a better position to produce accurate legal decisions by applying independent de novo review. At the time of the appeal, the factual record has been construed by the district court and settled for purposes of appellate review, enabling appellate judges to "devote their primary attention to legal issues." Since legal issues are the focus of appellate review, appellate counsel briefs will address these issues more extensively than at trial and provide appellate judges with more information and more comprehensive legal analysis. Additionally, the judgment . . . of an appellate panel is brought to bear on every case, minimizing the chance of judicial error. Minimal judicial error is necessary because appellate rulings of law become controlling precedent and affect the rights of future liti-

gants. Thus, the appellate court has the primary responsibility to decide questions of law under the de novo standard because such courts are in the best position to do so.

Kocoras, *supra*, at 1418 (citing *Salve Regina College v. Russell*, 499 U.S. 225, 231–32, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991) (quoting Dan T. Coenen, *To Defer or Not to Defer: A Study of Federal Circuit Court Deference to District Court Rulings on State Law*, 73 Minn.L.Rev. 889, 923 (1989)) (citations omitted) (brackets added).

Second, while the use of a "substantial basis" or "clearly erroneous" standard of review has been praised because it encourages the police to seek warrants prior to executing a search,

> the already defective warrant-issuing process may further deteriorate under the strain of an increase in warrant applications. Magistrates usually spend between three to ten minutes assessing probable cause. However, a "finding of probable cause by an experienced magistrate ... within two minutes after receiving the affidavit would be neither unreasonable nor unusual.'" Studies have indicated that magistrates "tend to ask no questions and to issue warrants in a routine fashion.'" A summary of a recent study reports:

> Too many warrant applications were filled with "boilerplate" language and were not fitted in detail to the situation at hand. The "oath or affirmation" requirement rarely played a significant role because of the large amount of hearsay or double hearsay on the affidavits. Proceedings before the magistrate generally lasted only two to three minutes and the magistrate rarely asked any questions to penetrate the boilerplate language or the hearsay in the warrant.... [T]he police often engaged in "magistrate shopping" for judges who would give only minimal scrutiny to the application.

An increase in warrant applications, therefore, will exacerbate the shortcomings of the warrant-issuing process. While the quantity of warrant applications may rise, the quality of the probable cause determi-nations underlying those warrants is bound to suffer. Misdirected appellate review, meanwhile, will continue to legitimate searches based on such warrants. The result will be more unanswered privacy violations and a further dilution of the probable cause standard.

Jeremy S. Simon, *Privacy v. Practicality: Should Alaska Adopt the Leon Good Faith Exception?*, Alaska L.Rev. vol. X, no. 1, 143, 164–65 (June 1993) (brackets in original and citations omitted).

Third, whether the evidence provided establishes probable cause is a determination often based on and limited to the four corners of the affidavit, such as in the instant case. Because the probable cause determination is limited to the four corners of the affidavit, the magistrate is not in a better position than the appellate court. Furthermore, because this determination involves the application of law rather than an evaluation of factual evidence, on review the appellate court is not limited to a determination of whether the district court's finding was clearly erroneous or whether there was substantial basis for concluding that probable cause existed.

### B. *Hawaii's Reviewing Courts Shall Conduct De Novo Review for Determinations of Probable Cause*

█ Article I, section 7 of the Hawai['']i Constitution[, which expressly guarantees the right to privacy,] protects people from unreasonable government intrusions into their legitimate expectations of privacy. *State v. Clark*, 65 Haw. 488, 493, 654 P.2d 355, 359 (1982); *see also State v. Fields*, 67 Haw. 268, 282, 686 P.2d 1379, 1390 (1984). And, as "the ultimate judicial tribunal in this state," this court has final, unreviewable authority to interpret and enforce the Hawai['']i Constitution. *Fields*, 67 Haw. at 282, 686 P.2d at 1390. " 'The basic purpose ... [of these constitutional provisions] is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.' *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). The constitutional proscription ... that

the person and effects of an individuals [sic] are considered to be sacrosanct and may not be the object of unreasonable searches and seizures ... draws no distinction in its application between an individual suspected of criminal activity and one who is not." *Nakamoto v. Fasi,* 64 Haw. 17, 20, 635 P.2d 946, 950 (1981) (brackets added). Thus, article I, section 7 of the Hawai['];i Constitution was "designed to protect the individual from arbitrary, oppressive, and harassing conduct on the part of government officials." *Fasi,* 64 Haw. at 23, 635 P.2d at 952. *Quino,* 74 Haw. at 177–78, 840 P.2d at 365–66 (Levinson, J., concurring) (brackets in original). It is precisely because of the more extensive right of privacy provided in article I, section 7 of the Hawai'i Constitution than that of the United States Constitution that we choose to afford greater protection to the citizens of Hawai'i by providing the most substantial scrutiny to the warrant application by rejecting the "substantial basis" and "clearly erroneous" standards of review and, instead, reviewing cases, such as the present, "*de novo.*"

Another reason for adopting a *de novo* standard of review when reviewing a magistrate's determination of probable cause to issue a search warrant is its consistency with our past decisions to review motions to suppress *de novo* or under the "right/wrong" standard. *See, e.g., State v. Hoey,* 77 Hawai'i 17, 32, 881 P.2d 504, 519 (1994) (reviewing *de novo* on the ultimate issue of voluntariness of waiver); *State v. Kelekolio,* 74 Haw. 479, 502, 849 P.2d 58, 69 (1993) (reviewing *de novo* on the ultimate issue of voluntariness of confession).

■ Therefore, in light of: (1) article I, section 7 of the Hawai'i Constitution, which provides Hawai'i's citizens greater protection against unreasonable searches and seizure than the United States Constitution; (2) the advantages of reviewing probable cause determinations *de novo* as discussed in part I.A.3; and (3) the importance of consistency with our recent decisions involving motions to suppress, the determination of probable cause for the issuance of a search warrant warrants *de novo* review on appeal.

## C. *Application of the De Novo Standard of Review to the Present Case*

■ In the present case, Officer Roberts, upon receiving the informant's information, conducted a thorough police investigation, which revealed that all of the verifiable parts of the informant's information were true. The investigation also revealed that Edward's police record provided support for the credibility of the informant's information. The informant's information and the police investigation led the police to contact Edward by telephone at his residence to arrange a drug sale from Edward to Officer Roberts acting in an undercover capacity. All of these facts known to the police, including their telephone conversations with Edward and the fact that Edward went from his residence to the meeting and returned to his residence via an indirect route after the meeting, led the police to believe that Edward had drugs in his car and/or residence and therefore to seek a search warrant authorizing a search of his car and house.

Upon *de novo* review, we hold, based on the facts set forth in the affidavit of Officer Roberts, that there was probable cause to issue the search warrant in this case.

## III. *CONCLUSION*

Accordingly, we disapprove and reject the ICA's standard of review, but leave undisturbed the ICA's affirmance of the district court's issuance of the search warrant in this case.