**UNITED STATES of America**

v.

**Patrick GAWRYSIAK and Edmund Danzig, Defendants.**

**Criminal No. 96–676.**

United States District Court,
D. New Jersey.

April 22, 1997.

Faith S. Hochberg, United States Attorney
by Mark Costello, Assistant U.S. Attorney,
Newark, NJ, for U.S.

William E. Lawler, III, Vinson & Elkins, LLP, Washington, DC, for Defendant Danzig.

Christopher M. Hartwyk, South Orange, NJ, for Defendant Gawrysiak.

## OPINION

SIMANDLE, District Judge:

This matter is before the court upon the pretrial motion of defendant Edmund Danzig to suppress evidence obtained during a search conducted on October 24, 1996, at his business premises. Defendant Danzig has been charged in an indictment with one count of wire fraud, in violation of 18 U.S.C. § 1343 and 2. Mr. Danzig's co-defendant, Patrick Gawrysiak, has been charged with various forms of fraud in the same indictment, but has not made any pretrial motions. For the reasons stated herein, defendant Danzig's suppression motion will be denied.

### Factual Background

On October 18, 1996, agents from the Federal Bureau of Investigation ("FBI") obtained a warrant to search the business premises of defendant Danzig in Sarasota, Florida. (Df.Ex. A). The warrant was issued by United States Magistrate Judge Mark A. Pizzo of the Middle District of Florida, in Tampa, on the basis of a 24–page affidavit filed with the court by Special Agent Lynn Billings of the FBI. (Df. Ex. C, hereinafter referred to as "Aff.").

By its terms, the warrant imposed four primary limitations on what items could be seized from defendant Danzig's place of business. First, the agents were only permitted to seize evidence of violations of the following federal criminal statutes: 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1621 (perjury), and 18 U.S.C. § 1623 (false declarations). Second, the warrant encompassed evidence concerning crimes committed by Edmund Danzig, Patrick Gawrysiak, Thomas Fox and their co-conspirators only. Third, the warrant only encompassed evidence of these crimes committed by those individuals between 1992 and 1995. Fourth, the warrant explained that the evidence to be seized had to pertain to

one of sixteen enumerated persons or entities, such as "Edmund R. Danzig," "Terra Ceia Ventures, Inc.," or "Jonathan Bowers." These terms of the warrant were set forth in Attachment B to the warrant.

The affidavit submitted to Magistrate Judge Pizzo, subscribed by Special Agent Lynn M. Billings, gave the details of pervasive fraud investigations being conducted by the FBI's Special Agent Wadsworth in New Jersey and Special Agent Lynn Williams in Virginia targeting Patrick Gawrysiak and identifying Danzig as a co-conspirator. (Aff.¶¶ 3–7). Gawrysiak, using the alias Gray, claimed to be the principal of Great American Raceways International, Inc. ("GARI"), (Aff.¶ 8), which issued forged GARI bonds falsely claimed to be backed by U.S. Treasury bonds. (Id.). Danzig was described as President of Terra Ceia Ventures, Inc., a financially troubled company which had undertaken a real estate development project on Terra Ceia Island, Florida, for which Danzig and Gawrysiak sought interim financing ("bridge financing"). Gawrysiak had allegedly victimized numerous investors and potential business partners through this and other fraudulent schemes involving forged bonds, bogus financial statements, and fraudulent claims of oversees financing. (Aff.¶ 6). The affidavit disclosed that through Agent Wadsworth's investigation Gawrysiak's apartment in New Jersey had been searched pursuant to a warrant in September 1995, and that documents of Gawrysiak's frauds including documents linking Gawrysiak and Danzig, were seized. (Aff.¶ 6, n. 1).

The affidavit laid out the contours of four known frauds allegedly involving Danzig occurring between 1992 and January 1996, which were:

(1) a scheme involving misappropriation of at least $250,000 as "loans" from Moors & Cabot brokerage accounts by Thomas Fox to Edmund Danzig in 1992 and 1993 (Aff.¶¶ 23–25);

(2) a scheme involving a $60,000 loan from Jonathan Bowers in 1993 for bridge financing for the Terra Ceia project, in which Danzig allegedly falsely repre-

sented to Bowers that a $100,000 GARI bond secured repayment of Bowers' note when in fact Danzig knew the GARI bonds to be worthless (Aff. ¶¶ 14–16 and Exs. 1–6 thereto);

(3) a scheme to gain a $1 million loan from Citizen's Bank to be collateralized by Gawrysiak's forged GARI bonds in May and June 1993 (Aff. ¶¶ 11–13 and Exs. 1–3 thereto);

(4) a scheme to falsely represent to victim Paul Maillis that Danzig had $40 million in financing, and that Maillis' loan to Danzig would be backed by the worthless GARI bonds (Aff.¶¶ 21–22).

The affidavit supporting the warrant also attached numerous exhibits as examples of the forgeries and misrepresentations mentioned in the affidavit. In addition to the fraud schemes, the affidavit also outlined proof of Danzig's alleged perjury when testifying in a civil lawsuit brought by Bowers against Fox, Gawrysiak, and Danzig in the U.S. District Court for the District of Columbia. Testifying at that trial in January 1996, Danzig denied knowing on August 20, 1993, that the GARI bonds were worthless, contrary to Danzig's statements to Agent Wadsworth and the record of loan negotiations with Citizen's Bank. (Aff.¶¶ 17–18). This allegedly evidenced perjury and false testimony, in violation of 18 U.S.C. §§ 1621 & 1623, as alleged in the affidavit.

The affidavit also described ties between Danzig and Fox arising from the Virginia investigation, in which Danzig received transfers of funds from Moors & Cabot customers through intermediary accounts, allegedly victimizing ten investors for a total of $250,000. (Aff.¶ 24). The affidavit alleges that none of these transfers were authorized by the brokerage clients and none of the money was repaid by Danzig. (Id.).

The affidavit demonstrated that evidence of Danzig's culpability for these schemes was likely to be found at his office, as well as evidence implicating others in these crimes even if Danzig is himself innocent.

The affidavit is too detail-rich to fully recount here. It adequately tied together the various accomplices, victims, and other actors into a highly articulated demonstration of a pattern of fraud characterized by the "advanced fee scheme" concept. The advanced fee scheme fraud, as allegedly perpetrated by Gawrysiak with the help of Danzig and others, involved forged bonds, other forged documents, fraudulent claims of access to overseas financing, and bogus financial statements seeming to come from banks and respected accounting firms, to induce investors to loan money in reliance on these misrepresentations.

On October 24, 1996, FBI agents executed the search, seizing from defendant's place of work approximately five boxes of various materials as well as copies of defendant's computer files.

In moving to suppress the seized items, defendant Danzig alleges primarily that: 1) the search warrant issued by Judge Pizzo was overbroad and therefore invalid; and 2) the law enforcement agents conducting the search acted in bad faith and with the intent to seize items beyond the scope of the warrant. In evaluating these claims, the court has before it documentary evidence such as the search warrant and the affidavit made in support of the warrant and the documentary evidence which served as an appendix to the affidavit, as well as the suppression hearing testimony of Special Agent Donald A. Wadsworth of the FBI. Agent Wadsworth, who testified on behalf of the United States, was the sole witness to testify at the suppression hearing, which was conducted by this court on April 3, 1997.

Agent Wadsworth testified at the hearing that he was one of the six FBI agents who conducted the search of defendant Danzig's premises, along with Special Agents Lynn M. Billings, Richard Blake, Vincent Rosado, James Handley, and Rod Huff. Although Mr. Danzig's office is located in Sarasota, Florida and Agent Wadsworth is based in Atlantic City, New Jersey, Agent Wadsworth went to Florida to lead the search team. Agent Wadsworth had also previously interviewed Mr. Danzig in the same Sarasota office that was the subject of the search warrant, so he was familiar with the premises in question. It had been determined that Agent Wadsworth's presence would be necessary at the

search because of his familiarity with this case and with illegal fraud schemes in general.

In the days leading up to the warrant application on October 18 and the search on October 24, Agent Wadsworth had extended conversations with Agent Billings, giving her the details of the investigation so that she could be a knowledgeable affiant. He had also sent her his investigation case report including the leads being pursued in the investigation.

Agent Wadsworth testified that before commencing the search, the other five agents participating in the search met with him to discuss how to conduct the search at the Sarasota FBI at 8:00 a.m. The meeting lasted approximately 30 minutes. Agent Billings gave a presentation about the search plan and made the warrant available to the others. For part of that time, Agent Wadsworth described to the other agents the type of fraudulent schemes believed to be involved in this case. Agent Wadsworth reviewed Attachment B of the warrant with the searching agents, and Agent Billings also gave a short presentation regarding the substance of her search warrant affidavit and the conditions imposed by Attachment B.[1] A copy of the warrant as well as Agent Billings' affidavit made in support of the warrant were made available to the agents. Agent Wadsworth testified that he personally saw each of the agents read Agent Billings' affidavit.

According to Agent Wadsworth, the agents also reviewed the "Search Plan" that had been drafted by Agent Billings. (*See* Df. Ex. B). The Search Plan set forth the background of the government's investigation of defendants Gawrysiak and Danzig, and described the responsibilities of each of the six agents participating in the search. Attachment B to the warrant had apparently been appended to the search plan, as had a separate list of names and entities that were not mentioned in the warrant itself or the affidavit supporting the warrant. (*See id.*). The fourteen persons listed on this latter page were persons whom the investigating agent

believed to be victims of the fraudulent schemes allegedly perpetrated by the defendants, which were described in the warrant; it was thought that files with the names of these victims might be "markers" signalling a file with evidence that might meet the four criteria, above, and so these individual names in the search plan were to be used as a guide, not as a separate rationale for seizure of documents. The ten business entities listed were believed by the government to be companies that had been promoted by stockbroker Thomas Fox as part of the fraudulent schemes allegedly orchestrated by Fox and the defendants in this case; again, it was believed that files or documents with the names of these related entities could contain evidence of the crimes meeting the criteria described in the warrant.

At the suppression hearing, Agent Wadsworth testified that this list of victims and "pet companies" was intended to be used as "flags" for the searching agents to aid the agents in their search for documents that fell within the scope of the warrant. Wadsworth and Billings feared that without such a list, the other agents might have difficulty in searching through reams of documents that could potentially be evidence of the complicated "advance-fee" fraud schemes allegedly carried out by these defendants. Wadsworth testified that he understood that the scope of the search was defined only by the warrant and its Attachment B, and he noted further that all documents were reviewed before they were seized to ensure that they fell within Attachment B. According to Wadsworth, the victims/pet companies list was used only to limit the search and to facilitate the search by providing potentially helpful information to the searching agents.

Agent Wadsworth further testified that the agents used substantial care during the search itself. The premises before, during, and after the search were photographed by Special Agent Blake. Also, because of concern that defendant Danzig's files might contain privileged attorney/client information, Agent Huff, who is also an attorney, was

---

1. Special Agent Billings also testified by way of her affidavit at the suppression hearing, which confirms the care taken during the search plan briefing to assure all agents were prepared to properly execute the warrant. (Billings Aff., signed Mar. 17, 1997).

assigned the responsibility of functioning as a "Chinese Wall" during the search and seizure to ensure that the other agents would not come in contact with such potentially privileged documents. Special Agent Wadsworth briefed Special Agent Huff at length about the scope of the investigation and of the intended search, so that Huff could perform the privilege-screening duties on site during the search. Agent Rosado, who has special training in the retrieval of computer files, was assigned the task of seizing materials in defendant Danzig's computer files. Agent Wadsworth knew that computer files would be part of the search because he had observed a computer in defendant Danzig's office when he interviewed Danzig there on July 11, 1996. (Gov.Ex. 4, ¶ 13). Rosado was a member of the FBI's Computer Assisted Recovery Team ("CART"). Instead of seizing defendant's computer hardware, Agent Rosado was able to copy defendant Danzig's electronically stored files on to computer equipment that Rosado had brought to the search. Rosado remained busy with these computer retrieval chores all day, copying the electronic disks but not producing or printing any paper copies.

Agent Wadsworth testified that all telephone logs, telephone messages, and information on computer was seized without independent review by Wadsworth himself. Agent Wadsworth personally reviewed all other documents and files, however, to determine whether seizure of the items would be permissible under the warrant. The other agents initially scanned potentially relevant documents, using the search plan and looking for evidence of fraudulent schemes involving the same pattern and modus operandi as was employed in the allegedly fraudulent schemes concerning which the government already had knowledge. Then, Agent Wadsworth, as the agent most familiar with the case, made the final determination concerning whether seizure would be appropriate within the warrant's terms.

According to Agent Wadsworth, out of approximately 200 boxes of documents in defendant Danzig's office, only five boxes of documents were ultimately seized. (Gov.Ex. 4, ¶ 21). The parties agree, however, that the agents seized approximately half of the documents in the office that pertained to the time period of 1992 through 1995. The government explains this substantial 50% ratio by arguing that within that time period, defendant Danzig's business affairs were pervaded by fraud.

Mr. Danzig was allowed to be present during the search. Afterward, the FBI furnished a detailed inventory of all documents taken, along with copies of same; defendant has pointed to no document that is beyond the scope permitted by the warrant, nor has defendant indicated that any seized document is within a privilege.

I find the testimony of Special Agent Wadsworth to have been credible and candid. His testimony was comprehensive, convincing, and essentially unrebutted. He described a careful and deliberate investigation of wide-ranging wire and mail fraud schemes in New Jersey, Virginia, and Florida. In general, he amply demonstrated that the agents participating in the search of defendant Danzig's premises used care and good faith in endeavoring to abide by the terms of the search warrant while conducting their search as quickly and efficiently as possible.

### Discussion

Defendant's contentions in support of his motion to suppress may be grouped into two general areas of inquiry: 1) whether Magistrate Pizzo issued a valid warrant that was sufficiently particularized and not a "general warrant"; and 2) whether the government's search team acted in good faith and properly executed the warrant. The court will address each of these questions separately.

### I. The Validity of the Warrant Issued by Judge Pizzo

#### A. Whether the Warrant Was a "General Warrant"·

One of the primary arguments made by defendant on this motion is that the warrant to search defendant's premises was so overbroad as to constitute an impermissible "general warrant."

■ The prohibition against general warrants stems directly from the text of the Fourth Amendment to the Constitution, which requires that all warrants describe "particularly ... the place to be searched, and the persons or things to be seized." As interpreted by the Supreme Court, this language prohibits a "'general, exploratory rummaging in a person's belongings.'" *Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976) (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971)). "The particularity requirement 'makes general searches ... impossible and prevents the seizure of one thing under a warrant describing another.'" *United States v. Christine,* 687 F.2d 749, 752 (3d Cir.1982) (quoting *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927)). On the other hand, "'no tenet of the Fourth Amendment prohibits a search merely because it cannot be performed with surgical precision.'" *United States v. Conley,* 4 F.3d 1200, 1208 (3d Cir.1993) (quoting *Christine,* 687 F.2d at 760). The terms of a search warrant must be read in context and not in isolation, in order to determine whether the warrant is sufficiently specific. *Id.*

■ Magistrate Judge Pizzo approved a warrant which found probable cause to believe that evidence of mail fraud and other crimes would be found at Mr. Danzig's business premises, as described with greater particularity in Attachment A to the search warrant. Attachment B, which is attacked as a general warrant, reads as follows:

[An authorized officer of the United States may seize from the premises in question] [e]vidence of violations of Title 18, United States Code, Sections 371, 1343, 1621 and 1623 between 1992 and 1995 by Edmund R. Danzig, Patrick Gawrysiak, a/k/a/ Patrick Gray, Thomas Fox, and their co-conspirators, by entities under their joint or several control, including Terra Ceia Ventures, Inc., Presidential Realty, Inc., Great American Raceways International, Inc., Gray Enterprises, and Potomac Capital Ventures Corporation, or by persons acting on behalf of these persons or entities, including Richard Katz and Roger Scully.

This evidence includes drafts or final versions of notes, letters, memoranda, fax cover sheets, ledgers, checks, check books, phone logs, address books, phone calling records, phone message slips, contracts, agreements, trust indentures, security guarantees, stock and bond certificates, financial statements, and any and all other records of, or pertaining to, the following persons or entities:

Edmund R. Danzig
Patrick Gawrysiak a/k/a Patrick Gray
Thomas Fox
Richard Katz
Roger Scully
Terra Ceia Ventures, Inc.
Presidential Realty, Inc.
Great American Raceways [Int'l], Inc.
Gray Enterprises
Potomac Capital Ventures Corporation
The National Westminster Bank of [N.J.]
The Westridge Trust
The First State Bank
Citizen's Bank of Washington, D.C.
Jonathan Bowers
Paul Maillis

Such records include information and/or data stored in the form of magnetic or electronic coding on computer media or media capable of being read by a computer and its components or with the aid of computer-related equipment, including floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, and any other media which is capable of storing magnetic coding, as well as all computer equipment and peripherals, the software to operate them and related instruction manuals, and records which constitute evidence of violations of Title 18 United States Code, Sections 371, 1343, 1621 and 1623.

In this case, the warrant imposed four significant limitations that channeled the discretion of the searching FBI agents and provided the particularized description required by the Constitution. First, the warrant provided that the agents were only permitted to seize evidence of violations of the federal criminal statutes concerning conspiracy, wire

fraud, perjury, and false declarations. *See Andresen,* 427 U.S. at 480–82, 96 S.Ct. at 2748–49 (upholding challenged phrase in warrant because, in part, phrase permitted law enforcement agents to seize evidence relating only to crime of false pretenses); *United States v. Johnson,* 690 F.2d 60, 64–65 (3d Cir.1982) (finding that warrant was not overbroad because it was limited to evidence relating to the manufacture of illegal drugs). Second, the warrant encompassed only crimes committed by Edmund Danzig, Patrick Gawrysiak, Thomas Fox, by the entities under their control (including Terra Ceia Ventures, Inc., Presidential Realty, Inc., Great American Raceways International, Inc., Gray Enterprises, and Potomac Capital Ventures Corporation), or by the attorneys acting on their behalf, Richard Katz and Roger Scully. Third, the warrant encompassed only the enumerated crimes committed by those individuals between 1992 and 1995. Fourth, the warrant provided that the evidence to be seized had to pertain to one of the sixteen persons or entities listed in Attachment B to the warrant. The affidavit supporting the testimony gave probable cause to believe that Danzig, Gawrysiak, and Fox and their entities were committing frauds involving the advanced fee schemes, and that the sixteen persons or entities in Attachment B were named in the affidavit as perpetrators, victims, or intermediaries.

Because of these limitations, this was not a warrant that provided the searching agents with unbridled discretion to rummage through defendant's possessions in search of any evidence of criminal activity. *See Christine,* 687 F.2d at 753. That conclusion is confirmed by the small percentage of documents actually seized from defendant's premises, indicating that the warrant did have limits that could be and were applied by the agents conducting the search.

■ The scope of this warrant was indeed relatively broad. Broad phrasing in a warrant, however, does not necessarily render the warrant invalid. The court concludes that the breadth of the warrant in this case was justified by evidence before Judge Pizzo indicating that defendant Danzig's business operations were substantially pervaded by fraud during the time period in question. *See United States v. American Investors of Pittsburgh, Inc.,* 879 F.2d 1087, 1106 (3d Cir.1989) (upholding broad warrant where "large bulk" of defendant's business dealings were affected by defendant's illegal activity); *United States v. Hooshmand,* 931 F.2d 725, 736 n. 12 (11th Cir.1991).

■ The terms of an affidavit and warrant " 'must be tested by courts in a common sense and realistic fashion.' " *Christine,* 687 F.2d at 760 (quoting *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965)). The scope of the search and seizure is to be measured "against the ambit of probable cause established by the affidavit upon which the warrant issued." *In re Impounded Case (Law Firm),* 840 F.2d 196, 200 (3d Cir.1988). When investigating fraud, the precise manner in which documents may be kept, the form that records may take, indeed the contours of the fraud itself, cannot usually be anticipated when the warrant is being framed. The warrant succeeds where it contains a reasonably particular description of documents to be seized, in the context of the criminality under investigation. The Fourth Amendment has never demanded that all details of the crime be known, and the crime solved, before the search warrant's probable cause requirement is met. It follows that the particularity requirement likewise cannot mean that all the documents likely to be evidence of that crime be specified beforehand.

Moreover, the court is unable to draft appropriate language for Attachment B that would have limited the scope of the warrant in a meaningful while not unduly restrictive way. *See United States v. Kepner,* 843 F.2d 755, 763 (3d Cir.1988) (upholding warrant even though language of warrant was broader than language of supporting affidavit, because more precise language in warrant would not have limited scope of search). This is one of the factors that distinguishes this case from cases cited by the defendant, such as *United States v. Leary,* 846 F.2d 592 (10th Cir.1988), which held that the irreducible minimum of the particularity requirement is to distinguish between items that can and cannot be seized. The court also has credit-

ed Agent Wadsworth's testimony that each of the agents participating in the search read the affidavit submitted to the magistrate in support of the search. Thus, each of the agents presumably was aware of the detailed information in the affidavit that would indicate what sorts of evidence the magistrate judge permitted them to seize at defendant Danzig's place of business. Each type of evidence identified in Attachment B had a context that was apparent from the circumstances described in the affidavit supporting the warrant. These provisions, when read in context and not in isolation, were sufficient to enable the executing agents to distinguish what could be seized after inspection from what could not. *See Conley,* 4 F.3d at 1208. For all of these reasons, the warrant issued by Judge Pizzo was not an unconstitutional "general warrant."

 In any event, even if for the sake of argument the warrant could be viewed as impermissibly overbroad, exclusion of the items seized pursuant to the warrant would not be an appropriate remedy in this case, because the executing agents reasonably relied on the validity of the warrant. The seminal case concerning this "good faith exception" to the exclusionary rule in instances involving an overbroad warrant is *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). In that case, the Supreme Court held that the exclusionary rule should not be applied when the officers conducting the search act in objectively reasonable reliance on a neutral magistrate's warrant that subsequently is found to be overbroad. *Id.* at 987–88, 104 S.Ct. at 3427–28; *see also United States v. Leon,* 468 U.S. 897, 900, 104 S.Ct. 3405, 3409, 82 L.Ed.2d 677 (1984) (holding that exclusionary rule should not be applied where evidence in question is obtained by "officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause").

Here, defendant Danzig does not dispute that Judge Pizzo was a "neutral and de-

tached" magistrate judge at the time he issued the warrant. Similarly, there is no evidence in the record indicating that the searching officers believed that the warrant was impermissibly overbroad or otherwise invalid. The court finds, moreover, that the agents' beliefs in this area were objectively reasonable. As noted previously, the warrant was limited in a number of material respects, and it is apparent that the agents used significant care in abiding by the terms of the warrant and carrying out its mandate. In short, to any extent that this warrant was overbroad, it was not obviously so. *See Kepner,* 843 F.2d at 764. Thus, even if the warrant was unconstitutionally overbroad, the evidence indicates that the agents executing the warrant had an objectively reasonable belief as to its validity.[2] Defendant is thus not entitled to suppression of the items seized on the grounds that this warrant was a "general warrant."

 The good-faith reliance exception is inapplicable where the affidavit offered in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). As phrased by the Supreme Court, the question to be asked is "whether a reasonably well-trained officer in [the affiant officer's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Malley v. Briggs,* 475 U.S. 335, 345, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986). In this case, as will be discussed below, it is plain that the affidavit submitted to Judge Pizzo established the probable cause necessary to justify issuance of the search warrant. Because no reasonable officer would have concluded that the affidavit failed to establish such probable cause, the good-faith exception to the exclusionary rule is available to the government in this case.

B. *Whether Magistrate Judge Pizzo had Probable Cause to Issue the Warrant*

Defendant also contends that the affidavit offered in support of the warrant did not

**2.** The good faith of the agents executing the warrant will be discussed more fully in Section II of this Opinion.

provide probable cause concerning certain portions of the warrant. Although defendant did not emphasize this point either in his moving papers or at oral argument, he apparently is seeking a court ruling as to the probable cause issue.

■ Where a search has been conducted pursuant to a warrant approved and issued by a magistrate judge, this court must exercise a deferential review of the initial probable cause determination made by the magistrate. According to the Supreme Court decision in *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983), the warrant is upheld so long as the magistrate had a "substantial basis for ... conclud[ing] that probable cause existed." The *Gates* Court thus admonished reviewing judges not to undertake a *de novo* review of the search warrant affidavit. The Court stated:

> [A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review.... A magistrate's determination of probable cause should be paid great deference by reviewing courts.... The duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for conclud[ing] that probable cause existed."

*Id.* at 236, 238, 103 S.Ct. at 2331, 2332.

The Third Circuit has also recently reaffirmed the vitality of the deferential standard of review under the substantial basis test, stating:

> In reaching our conclusion, we recognize that a different magistrate judge might have found the affidavit insufficient to support a warrant. However, our role is not to make our own assessment as to whether probable cause existed. Rather, we are constrained to determine only whether the affidavit provided a sufficient basis for the decision the magistrate judge actually made.

*United States v. Jones*, 994 F.2d 1051, 1057 (3d Cir.1993); *accord United States v. Williams*, 3 F.3d 69 (3d Cir.1993); *Conley*, 4 F.3d at 1205.

■ Such deference to the magistrate's finding of probable cause, however, falls short of insulating a search warrant from meaningful review. The substantial basis test " 'does not mean that reviewing courts should simply rubber stamp a magistrate's conclusions.' " *Conley*, 4 F.3d at 1205 (quoting *United States v. Tehfe*, 722 F.2d 1114, 1117 (3d Cir.1983)). The existence of probable cause to search depends on the magistrate judge's evaluation of all the relevant facts and circumstances in determining whether there is a fair probability that contraband or evidence of crime will be found in a particular place.

■ In this case, the government has easily demonstrated that Judge Pizzo had probable cause to issue the warrant authorizing the search of defendant Danzig's premises. The affidavit and appendix of documents filed in support of the warrant provides significant detail concerning how each of the sixteen entities/persons listed in Attachment B materially relates to the fraudulent schemes allegedly carried out by Gawrysiak and Danzig between 1992 and 1995. There was ample reason to believe that evidence concerning these crimes would be found in these premises at this time. The affidavit provides more than a substantial basis for Judge Pizzo's conclusion that probable cause to believe that evidence of these frauds would be found in Danzig's office existed in this case.

The government devotes eighteen pages in its brief to explaining in detail how the affidavit provides probable cause concerning the persons and entities set forth in Attachment B. The court declines to rehash that analysis herein, especially since defendant has offered minimal argument concerning the probable cause issue, and the court adopts the probable cause analysis at pages 14–32 of the Memorandum of the United States in Opposition, together with the court's preceding analysis herein. Based on the contentions as raised by the parties, it suffices to hold that Judge Pizzo properly issued the warrant in this case, supported by probable cause and particularized as to items to be seized.

## II. The Conduct of the Government Agents Executing the Search Warrant

The court will now proceed to address the second group of contentions raised by defen-

dant, which pertain to the conduct of the agents who executed the warrant issued by Magistrate Judge Pizzo.

### A. Whether the Agents Seized Items that Were Not Within the Scope of the Warrant

In his moving papers, defendant contends that "most of the documents seized from Mr. Danzig were outside the scope of the warrant."[3] (Df. Br. at 21). In support of this argument, defendant has submitted to the court his "Exhibit D," entitled "List of Individuals and Businesses Beyond the Scope of the Warrant." This two-page list is a cursory inventory of all of the subjects that defendant claims are mentioned in the seized documents and are not mentioned specifically in the warrant.

At the suppression motion, however, defendant seemed to concede to his adversary on this point. Specifically, when the court asked defense counsel to bring forward those seized documents that were not within the scope of the warrant[4], counsel declined to do so, for reasons he chose not to reveal.

In view of defendant's decision not to present to the court the specific documents that purportedly should be excluded as beyond the scope of the warrant, the court is unable to evaluate the merits of defendant's argument on this point. Certainly, defendant's burden is not satisfied by his production of his self-compiled Exhibit D. For example, the first of the many listings in Exhibit D is "Ira Adler." As with all the names and entities compiled in Exhibit D, defendant provides no description of the document(s) in which Mr. Adler's name appears or the context in which the name is mentioned. It would be irresponsible for the court to exclude a seized document based on the mere representation by defendant that the name Ira Adler appears in the document. Thus, defendant has not provided sufficiently specific arguments and evidence concerning which documents should be excluded or why such documents

were not within a reasonable interpretation of the scope of the warrant. Defendant's arguments on this point are therefore without merit.

### B. Whether the Agents "Flagrantly Disregarded" the Terms of the Search Warrant

At the suppression hearing, rather than point out for the court individual documents that were beyond the scope of the warrant in this case, defendant concentrated on arguing more generally that all seized documents should be suppressed because the government agents possessed "flagrant disregard" for the terms of the warrant. Defendant contends specifically that the agents went into the search with the intent to seize documents beyond the scope of the warrant. In terms of Fourth Amendment law, defendant's argument is premised on cases such as *United States v. Foster*, 100 F.3d 846, 851 (10th Cir.1996), which hold that "blanket suppression is mandated when the executing officers flagrantly disregard the particular terms of the warrant."

■ Defendant's argument fails, however, because of defendant's inability to demonstrate on the basis of the suppression hearing testimony or the documentary evidence submitted to the court that the searching agents displayed such a flagrant disregard for the warrant's terms. In fact, the record indicates that the agents executing the warrant exercised proper and reasonable care in carrying out the search authorized by Magistrate Judge Pizzo.

First, the record reveals that the search team brought in Special Agent Huff, an attorney, specifically to act as a "Chinese Wall" and ensure that the other agents did not come into contact with privileged attorney/client information. The search team suspected that correspondence between defendant Danzig and his attorneys, including

---

3. The court notes that this argument appears to contradict defendant's argument that the warrant issued by Judge Pizzo was so broad as to encompass anything in defendant Danzig's office. Such apparently contradictory arguments, however, are permitted and will be considered.

4. The record indicates that defendant possesses copies of all documents that were seized by the government agents.

intermediaries Richard Katz and Roger Scully, might be found in the office, and took careful and proper steps to avoid exposure to any such materials. Indeed, as defendant has not complained that any privileged information was seized, the screening was successful.

The second area that demonstrates the government's good-faith attempts to execute this search in an appropriate manner was the decision to bring Special Agent Wadsworth on to lead the search team. According to Agent Wadsworth, the government had originally intended to carry out the search of defendant's Florida place of business without Agent Wadsworth, who works out of New Jersey. When it became apparent, however, that the Florida-based FBI agents did not know enough about this case to execute this search in a precise and effective manner, Agent Wadsworth joined the search team.

The third area of Agent Wadsworth's unrebutted testimony that refutes defendant's "flagrant disregard" argument is Agent Wadsworth's description of the pre-search meeting. Agent Wadsworth testified that he and Agent Billings took approximately half an hour to discuss with the other agents how they should carry out the search. He described to the other agents the type of fraudulent schemes believed to be involved in this case. He also reviewed the Search Plan and Attachment B to the warrant with the searching agents and gave a short presentation regarding the conditions imposed by Attachment B. Each agent read the affidavit that had been drafted by Agent Wadsworth and subscribed by Agent Billings in support of the warrant.

In addition, during the course of the search itself, Agent Wadsworth, as the agent most familiar with the case, was asked to give his final approval before any documents were seized. The agents' care in carrying out this search is further demonstrated by the fact that only five boxes of items were seized by the agents, purportedly representing only 5% of the materials found in the area searched.

This unrebutted testimony indicates that, contrary to defendant's argument, considerable care went into the execution of the search warrant at issue in this case. The evidence refutes defendant's contention that this was a search without limits carried out by officers determined to rummage without bounds through defendant's belongings.

Defendant points to the Search Plan as evidence that the searching agents went into the search with the intent of violating the terms of the warrant. Specifically, defendant relies on the agents' possession of the list of "Victims" and "Companies Promoted by Fox," which was attached to the Search Plan but was not contained in Attachment B to the warrant. There is, however, no evidence before the court that demonstrates that the items seized that related to the "Victims" and "Companies Promoted by Fox" were beyond the scope of Attachment B. To the contrary, Agent Wadsworth's testimony reveals that these lists actually narrowed the agents' search and acted as "flags" for the agents, thereby merely facilitating the agents' attempt to find the items Judge Pizzo had authorized them to seize. Wadsworth testified that he understood that the scope of the search was defined only by Attachment B to the affidavit, and further that he reviewed all documents before they were seized to ensure that they fell within Attachment B. Moreover, the search plan itself states, under the section entitled "Evidence to be Seized," that "[t]he evidence to be seized during the execution of this search warrant is detailed in Attachment B." (Df.Ex. B).

In addition, as discussed previously, defendant has not presented to the court seized items that defendant believes were beyond the scope of the warrant. There is thus no evidence that there were significant quantities or categories of items seized pursuant to the Search Plan that fell outside the purview of Attachment B. Absent such a proffer, defendant's contention that the agents acted with the intent to disregard the warrant is without support.

Defendant also points to the government agents' confiscation of defendant's computer files as evidence of the allegedly reckless manner in which the agents conducted their search. Because the government has

not read any of the computer files since the copies were seized in the search, and because the government will not be using these computer files as evidence at trial but is instead returning the computer materials to the defendant, the defendant's motion to suppress the computer file information has become moot. We instead address the seizure of the computer files only for the purpose of assessing its probative value in support of defendant's proposition that these agents flagrantly disregarded the warrant's limitations. Defendant explains, and the government concedes, that all of defendant's computer files were seized without prior review concerning which of the documents that might be electronically preserved within those files fell within the scope of Attachment B. Initially, the court notes that the warrant issued by Judge Pizzo explicitly permitted the seizure of items stored electronically. This aspect of the warrant was based on probable cause to believe that some evidence of these crimes would be found on these computers, which had been observed in the premises by Wadsworth on July 11, 1996, according to Agent Billings' affidavit in support of the search warrant. Moreover, the government's conduct in this area was authorized by the Sixth Circuit's decision in *United States v. Henson,* 848 F.2d 1374 (6th Cir.1988), in which the court noted that the government was not obligated to sift at the search site through a large mass of computer files in an effort to segregate those files that fell outside the scope of the warrant. The government also defends its conduct by arguing that it could have simply seized and hauled off defendant's computer hardware itself. Instead, the government brought in a computer specialist to download defendant's files onto diskettes and copy the electronically stored information in the least intrusive way possible.

The manner in which defendant's computer files were seized requires scrutiny. The government argues that to review each electronically stored file individually before seizing it would have taken "weeks." Ideally, however, the agents could have at the least checked the date on which each file was created, and avoided copying those files that were created before the time period covered by the war-

rant. It is also clear, however, that the government's next step, if it pursued this evidence, would have been an inspection at the FBI's office, in which a computer specialist would have made the initial determination of which computer files were outside the 1992–1995 time period of the warrant.

 The court is not persuaded that the government's conduct with respect to the handling of the computer files justifies suppression of any items seized from Mr. Danzig's premises. Even as to the computer files specifically, the court concludes that the FBI agents acted with good faith and with the intent to carry out the search in an appropriate and efficient manner. A reasonable search of computer files may include copying those files on to a disk on the scene, for later time-consuming review of the index of documents to cull the relevant time periods and subject matters while returning the remainder. The Fourth Amendment's mandate of reasonableness does not require the agent to spend days at the site viewing the computer screens to determine precisely which documents may be copied within the scope of the warrant, so long as a review procedure promptly after seizure safeguards against the government's retention and use of computer-generated documents known to lie beyond a reasonable interpretation of the warrant's scope.

Furthermore, the U.S. Attorney has indicated that the government will not seek to introduce any evidence from these computer files. In fact, the government has agreed to return all of the copied computer files to defendant, unread and unused. Even if we assume that the computer files contained information which would have been determined to be beyond the search warrant's scope, such seizure of unprocessed and unread electronic information does not impair the overall legality of the search. *See Henson,* 848 F.2d at 1383 (noting that search is not rendered invalid solely because certain items outside the scope of warrant are seized, especially when those items are not introduced into evidence).

In short, defendant Danzig has not established his claim that the FBI agents exe-

cuting the search had a secret agenda and intended to disregard the terms of Judge Pizzo's warrant. Blanket suppression of the items seized is therefore unwarranted.

### Conclusion

The warrant that provided the authority for the search of defendant Danzig's place of business was not overbroad, and was properly supported by an affidavit establishing probable cause. Moreover, defendant has not demonstrated that the government seized items beyond the scope of the warrant or that the government agents flagrantly disregarded the terms of the warrant. Defendant's motion to suppress will therefore be denied.

The accompanying Order is entered.

### ORDER

This matter having come before the court upon defendant Edmund Danzig's motion to suppress the evidence seized by FBI agents from defendant's place of business, as well as upon the United States' motion for reciprocal discovery; and the court having heard oral argument and having conducted a suppression hearing on April 3, 1997; and the court having considered the submissions of the parties; and for the reasons stated in the Opinion of today's date;

IT IS this 22nd day of April 1997 hereby

ORDERED that defendant's motion to suppress is hereby *DENIED;* and it is

FURTHER ORDERED that the United States' motion for reciprocal discovery is hereby *GRANTED* pursuant to Fed. R.Crim.P. 16(b)(1).