**Electronically Filed
Supreme Court
SCWC-17-0000898
22-MAR-2022
07:54 AM
Dkt. 11 OPA**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

SAMSON K. KEANAAINA,
Petitioner/Defendant-Appellant.

SCWC-17-0000898

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-17-0000898; CR. NO. 3CPC-17-0000154)

MARCH 22, 2022

RECKTENWALD, C.J., NAKAYAMA, J.,
AND CIRCUIT JUDGE CRABTREE, ASSIGNED BY REASON OF VACANCY,
AND McKENNA, J., DISSENTING, WITH WHOM WILSON, J., JOINS

OPINION OF THE COURT BY NAKAYAMA, J.

Petitioner/Defendant-Appellant Samson K. Keanaaina

(Keanaaina) appeals the judgment of the Intermediate Court of

Appeals (ICA) affirming the Circuit Court of the Third Circuit's[1] (circuit court) denial of Keanaaina's motion to suppress evidence.  On certiorari, Keanaaina contends that the evidence against him – specifically, the contents of a gray backpack – should be excluded because (1) Hawai'i Police Department officers failed to comply with Hawai'i Revised Statutes (HRS) § 803-37's requirement that officers "demand entrance" before entering a building and (2) the resulting search of Keanaaina's backpack exceeded the terms of the search warrant the officers executed.

Keanaaina is incorrect.  First, the statutory obligation to "demand entrance" only applies when the building's entrance is "shut."  It cannot feasibly be said that the entrances to the tent structure – which had multiple openings between the materials forming its walls – were shut.  Thus, the officers did not need to demand entrance, nor did the officers' actions constitute a breaking.  Moreover, the purposes of HRS § 803-37 were satisfied when the officers' entry did not create any risk of harm.  Second, there was no indication that the backpack belonged to Keanaaina.  The searches of the backpack consequently did not exceed the terms of the search warrant.  We therefore affirm the ICA's June 5, 2020 Judgment on Appeal.

---

[1]    The Honorable Melvin H. Fujino presided.

## I.   BACKGROUND

### A.   Factual Background

On the morning of March 8, 2017, police officers executed a search warrant for Michelle Wright's (Wright) tent structure located in a tent encampment within the Old Kona Airport Park.   The warrant authorized the search of

> The residence of Michelle WRIGHT described as a homeless campsite consisting of various color and size tarpaulins at the Old Kona Airport beach park, located at the north end of Kuakini Highway, behind the Hawaiʻi State Parks and Recreation maintenance building.   Said campsite is situated on land belonging to the County of Hawaiʻi (Old Kona Airport) and Queen Liliuokalani Trust (corner of Kuakini Hwy and Makala Blvd); to include but not limited to all rooms, boxes, toolboxes, suitcases, handbags, safes, backpacks, fanny packs, bags, storage containers, wallets, purses, papers, utility receipts and clothing located within said camp and/or stored outside-near the camp, wherever located within the County and State of Hawaiʻi . . . [.]

The affidavit in support of the search warrant included two photographs depicting Wright's campsite.   In executing the search warrant, the officers knew that it was possible that they would find Keanaaina in Wright's tent structure.

When the officers entered the tent encampment at least fifteen feet away from Wright's tent structure, they announced their presence and asked encampment residents to exit their tents.[2]   At the time of the search, it appears that the encampment consisted of approximately seven separate campsites. It appears from the record that one campsite was covered by a

_____

[2]     The officers asked encampment residents to exit their tents to ensure the officers' safety, not to search the other tents.

3

single orange tarpaulin, one campsite consisted of a tent with an additional gray tarpaulin covering, one campsite consisted of a blue tarpaulin wall and silver roof, one campsite was covered by a dark material and a blue umbrella, one campsite consisted of a single tent, and one campsite was covered by a single blue tarpaulin. The seventh campsite belonged to Wright.

Given the composition of Wright's tent structure, there was no obvious entrance or exit. However, the tent structure was "open" such that a person could enter and exit without moving any of the materials that formed its walls, the officers could look into the tent from the outside, and the officers could search inside of the tent without using flashlights.

Looking through a large opening in the tent structure, Detective Michael Hardie (Detective Hardie) saw Wright and Keanaaina sleeping on a mattress inside. Detective Hardie repeated the officers' announcements that police were present and asked Wright and Keanaaina to exit the tent structure. After at least two minutes, Wright woke up and exited the tent structure through a small opening on the north end of the structure. Keanaaina continued sleeping. Detective Hardie attempted to wake Keanaaina by shouting into the tent structure for a few more minutes, but was unsuccessful. Wright

subsequently informed the officers that Keanaaina was hard of hearing.

Based on Wright's statement, Detective Hardie entered the tent structure by "mov[ing] aside" a piece of fabric under the opening through which he observed Wright and Keanaaina. Detective Hardie also moved a couch so that he could walk in a straight line to the bed where Keanaaina was sleeping. However, Detective Hardie could have walked around the couch to enter the tent structure.[3] Detective Hardie woke Keanaaina and instructed him to exit the tent. Before exiting the tent, Keanaaina allegedly asked Detective Hardie "where's my backpack[?]"

Once Wright and Keanaaina were outside of the tent structure, the officers searched the tent structure and found, inter alia, a leopard-print backpack and a gray backpack.

---

[3] Keanaaina testified that:

> [State's Counsel]: Okay. In the area of that pink, the pink sheet in the front on the makai side of the tent --
>
> [Keanaaina]: Yes.
>
> [State's Counsel]: -- wasn't there a couch there on the inside?
>
> [Keanaaina]: Under the opening, yeah.
>
> [State's Counsel]: Okay. There's a couch; right?
>
> [Keanaaina]: No, not in the way but it's on the side. You can walk around. Michelle used that pink for block the doorway so you cannot see in.

(Emphasis added.)

During an initial search inside of the tent structure, the officers found a bag of marijuana within the gray backpack. The officers took the gray backpack to the police station for a more thorough search. During the second search, the police found Keanaaina's identification, methamphetamine residue, and drug paraphernalia in the gray backpack.

The State subsequently charged Keanaaina by complaint with one count of promoting a dangerous drug in the first degree, in violation of HRS § 712-1241(1)(a)[4]; two counts of prohibited acts related to drug paraphernalia, in violation of HRS § 329-43.5(a)[5]; three counts of promoting a dangerous drug in the third degree, in violation of HRS § 712-1243(1)[6]; one count

---

[4]     HRS § 712-1241(1)(a) (Supp. 2016) provides in relevant part: "[a] person commits the offense of promoting a dangerous drug in the first degree if the person knowingly: (a) [p]ossesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of: (i) [o]ne ounce or more, containing methamphetamine . . . ."

A "dangerous drug" is "any substance or immediate precursor defined or specified as a 'Schedule I substance' or a 'Schedule II substance' by chapter 329, or a substance specified in section 329-18(c)(14), except marijuana or marijuana concentrate." HRS § 712-1240 (2014). Methamphetamine is a Schedule II substance. HRS § 329-16(e)(2) (2010).

[5]     HRS § 329-43.5(a) (Supp. 2016) provides in relevant part:

> it is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter.

[6]     HRS § 712-1243(1) (2014) provides: "[a] person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount."

of promoting a detrimental drug in the second degree, in violation of HRS § 712-1248(1)[7]; and one count of attempted promoting a controlled substance in, on, or near schools, school vehicles, public parks, or public housing projects or complexes, in violation of HRS §§ 705-500(1)(b),[8] 712-1249.6(1).[9]

## B.    Pre-Trial Proceedings

Keanaaina sought to suppress his identification and the evidence obtained from the gray backpack on the basis that the officers' entry into the tent structure and subsequent

---

[7]    HRS § 712-1248(1) (2014) provides in relevant part: "[a] person commits the offense of promoting a detrimental drug in the second degree if the person knowingly . . . [p]ossesses one or more preparations, compounds, mixtures, or substances, of an aggregate weight of one ounce or more, containing any marijuana."

[8]    HRS § 705-500(1)(b) (2014) provides: "[a] person is guilty of an attempt to commit a crime if the person . . . [i]ntentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime."

[9]    HRS § 712-1249.6(1) (2014) provides in relevant part:

> Promoting a controlled substance in, on, or near schools, school vehicles, public parks, or public housing projects or complexes.  (1) A person commits the offense of promoting a controlled substance in, on, or near schools, school vehicles, public parks, or public housing projects or complexes if the person knowingly:
>
> (a) Distributes or possesses with intent to distribute a controlled substance in any amount in or on the real property comprising a school, public park, or public housing project or complex;
>
> (b) Distributes or possesses with intent to distribute a controlled substance in any amount within seven hundred and fifty feet of the real property comprising a school, public park, or public housing project or complex[.]

search of the backpack violated HRS § 803-37[10] because the

officers needed to demand entrance to the tent structure before

they could search his bag.

Keanaaina additionally argued that the search of his

bag exceeded the scope of the warrant, which authorized the

search of

> The residence of Michelle WRIGHT described as a homeless
> campsite consisting of various color and size tarpaulins at
> the Old Kona Airport beach park, located at the north end
> of Kuakini Highway, behind the Hawai'i State Parks and
> Recreation maintenance building. Said campsite is situated
> on land belonging to the County of Hawai'i (Old Kona
> Airport) and Queen Liliuokalani Trust (corner of Kuakini
> Hwy and Makala Blvd); to include but not limited to all
> rooms, boxes, toolboxes, suitcases, handbags, safes,
> backpacks, fanny packs, bags, storage containers, wallets,
> purses, papers, utility receipts and clothing located
> within said camp and/or stored outside-near the camp,
> wherever located within the County and State of Hawai'i
> . . . .

Specifically, Keanaaina claimed that since the warrant was

targeted at Wright, it did not "support a . . . search of his

belongings." Keanaaina also asserted that the search warrant

---

[10]     HRS § 803-37 (2014) provides:

> Power of officer serving. The officer charged with the
> warrant, if a house, store, or other building is designated
> as the place to be searched, may enter it without demanding
> permission if the officer finds it open. If the doors are
> shut the officer must declare the officer's office and the
> officer's business, and demand entrance. If the doors,
> gates, or other bars to the entrance are not immediately
> opened, the officer may break them. When entered, the
> officer may demand that any other part of the house, or any
> closet, or other closed place in which the officer has
> reason to believe the property is concealed, may be opened
> for the officer's inspection, and if refused the officer
> may break them.

did not comply with constitutional prohibitions "that no warrants shall issue absent ' . . . particularity describing . . . . [sic] things to be seized.'"[11]

Following a hearing, the circuit court denied Keanaaina's motion. As relevant here, the circuit court found that Detective Hardie "called into the structure numerous times, announcing police presence and search warrants."

The circuit court additionally found that "neither [Detective] Hardie nor any of the other officers were aware that a backpack inside the tent belonged to [Keanaaina] prior to the tent being search[ed] or whether any particular backpack belonged to [Keanaaina]." When the officers first searched the gray backpack, "contraband was found within the backpack, including marijuana and small zip bags." "When the [gray] backpack was searched at the Kealakehe Police Station, identification cards for Samson Keanaaina were observed within it and photographed."

The circuit court therefore reached three relevant conclusions of law. First, "[w]hen the officers observed the

---

[11]     Keanaaina superficially identified this "Particularity of Warrant" claim on appeal, but did not present any argument to the ICA pertaining to the breadth of the search warrant.

On certiorari, Keanaaina does not claim, much less argue, that the search warrant constituted an unlawful general warrant. Keanaaina therefore expressly abandoned his general warrant claim, and we do not address this basis for Keanaaina's motion to suppress any further. Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4).

items of identification . . . , the items of identification were in plain view, as the initial intrusion was justified by the valid search warrant."

Second, "[t]he officers did not need to comply with the requirements of [HRS § 803-37] because there was no 'breaking' of any door to gain entrance to the structure." This was because "[w]hen Ms. Wright exited the Wright Residence, her 'door' was voluntarily opened, and there is no need for officers to knock and announce." Nevertheless, the circuit court determined that

> the officers did comply by loudly announcing police presence, the police business (search warrants), and instructions to exit the tents. Having waited outside the structure for several minutes after the announcements before Ms. Wright exited the Wright Residence, then taking additional minutes to call into the tent to rouse the defendant, the officers waited a reasonable time to enter the structure.

The circuit court therefore concluded that the officers' actions "respected the purposes of the knock and announce rule and did not offend constitutional protections."

Third, the search warrant authorized the officers "to search 'plausible repositories' found within the Wright Residence . . . ." Here, "[t]he backpack which contained [Keanaaina's] identification cards . . . was not clearly the property of [Wright or Keanaaina] . . . , so the search of the backpack was not improper."

## C.    Trial Proceedings

On September 12, 2017, the case proceeded to a jury trial. The jury convicted Keanaaina for one count of prohibited acts related to drug paraphernalia; one count of promoting a dangerous drug in the third degree; one count of promoting a detrimental drug in the third degree; and one count of attempted promoting a controlled substance in, on, or near schools, school vehicles, public parks, or public housing projects or complexes.

The circuit court entered its Judgment of Conviction and Sentence on November 17, 2017.

## D.    ICA Memorandum Opinion

Keanaaina appealed the circuit court's Judgment of Conviction and Sentence to the ICA, arguing, inter alia, that the circuit court should have granted Keanaaina's motion to suppress.[12] The ICA affirmed the circuit court decision.

First, the ICA concluded that the officers "complied with the requirements and purposes of HRS § 803-37 and the Circuit Court did not err when it denied Keanaaina's Motion to Suppress." Citing State v. Dixon, 83 Hawai'i 13, 14, 924 P.2d 181, 182 (1996), the ICA noted that "[t]he purposes of this so-called knock and announce rule are to '(1) reduce the potential

---

[12]    Keanaaina also asserted that the trial court should have dismissed a juror for potential bias and that he received ineffective assistance of counsel. Keanaaina repeats these claims in his application for writ of certiorari. These arguments lack merit for the reasons discussed in the ICA's memorandum opinion.

11

of violence to both occupants and police resulting from an unannounced entry; (2) prevent unnecessary property damage; and (3) protect the occupant's right to privacy.'" The ICA explained that the statute did not require the officers to "knock" on the tent, but merely to announce their presence, which the officers did repeatedly. The ICA added that there was little risk of property damage or injury when the officers could see into the tent structure and waited a reasonable time before entering to wake Keanaaina. The ICA acknowledged that the waiting period also "protected Keanaaina's privacy as much as possible."

Second, the ICA held that the officers were authorized to search the gray backpack. The ICA reasoned that, under this court's precedent in State v. Nabarro, 55 Haw. 583, 587-88, 525 P.2d 573, 576-77 (1974), a valid search warrant authorizes officers to inspect bags in the specified search area so long as the officers did not have "notice of some sort of the ownership of a belonging[.]" The ICA pointed out that "[t]here is no evidence in the record that the police knew that the gray backpack belonged to Keanaaina prior to searching it." The ICA further noted that the officers did not identify the gray backpack as Keanaaina's until the police station search, at which point the bag's contents were admissible under the plain

view doctrine because they were "observed after warrant-authorized opening of the backpack[.]"

## II.  STANDARD OF REVIEW

### A.  Motion to Suppress

"[W]e review questions of constitutional law under the 'right/wrong' standard."  State v. Jenkins, 93 Hawaiʻi 87, 100, 997 P.2d 13, 26 (2000) (citing State v. Toyomura, 80 Hawaiʻi 8, 15, 904 P.2d 893, 900 (1995)).  Accordingly, "[w]e review the circuit court's ruling on a motion to suppress de novo to determine whether the ruling was 'right' or 'wrong.'"  State v. Kauhi, 86 Hawaiʻi 195, 197, 948 P.2d 1036, 1038 (1997) (citing State v. Navas, 81 Hawaiʻi 113, 123, 913 P.2d 39, 49 (1996)).

## III. DISCUSSION

### A.  The officers complied with the requirements of HRS § 803-37.

The text of HRS § 803-37 provides in relevant part:

> The officer charged with the warrant, if a house, store, or other building is designated as the place to be searched, may enter it without demanding permission if the officer finds it open.  If the doors are shut the officer must declare the officer's office and the officer's business, and demand entrance.  If the doors, gates, or other bars to the entrance are not immediately opened, the officer may break them.

The statute thus creates a two-stage inquiry for determining whether and how an officer may enter a building to execute a search warrant.  We first ask whether the structure is "open."  If so, an officer may enter without taking any further action, and that is the end of the inquiry.  If not, we then ask if the

officer "demand[ed] entrance."  If so, the officer may "break" any bars to entrance if they are not immediately opened and enter.  If not, the officer should not enter the building or break its bars to entrance.

Applying this order of inquiry to the present case, the circuit court correctly determined that HRS § 803-37 did not require the officers to demand entrance because (1) Wright's tent structure was open and (2) Detective Hardie's actions consequently did not constitute a breaking.  Additionally, although HRS § 803-37 did not require the officers to demand entrance, we note that they effectively carried out the statute's policy goals.

1.  **The officers did not need to demand entrance into the open tent structure.**

According to Keanaaina, HRS § 803-37 obligated the officers to demand entrance to Wright's tent structure because Detective Hardie used force to lift a sheet and move a couch before entering.

This contention improperly reverses HRS § 803-37's order of inquiry by assuming that the existence of any bars to entrance into a building renders the building shut for purposes of HRS § 803-37.  Common sense proves otherwise.  For example, a building may have a double door entry.  If one of the two doors is shut, it would form a bar to entrance.  However, so long as

14

the other door is open, the building is also open for purposes of HRS § 803-37.

That is precisely the case here. The record shows that there were numerous openings into Wright's tent structure.[13] Notably, Wright used one of these openings to exit the tent structure.[14] The tent structure was consequently open insofar as there was an entrance that the officers could have used to enter the structure without lifting or moving any of the tarpaulins or materials that formed its walls. Under these circumstances, HRS § 803-37's mandate that an officer "demand entrance" when "the doors are shut" is inapplicable. See HRS § 803-37.

2. **Detective Hardie's actions could not constitute a breaking that required the officers to demand entrance.**

Citing State v. Harada, 98 Hawai'i 18, 41 P.3d 174 (2002), Keanaaina further argues that Detective Hardie's uses of force to lift a sheet of fabric and move a couch constituted breakings that triggered HRS § 803-37's requirement that the officers demand entrance. However, this argument incorrectly assumes that any use of force causes a breaking for which the

---

[13]  For the purposes of this proceeding, this court assumes without deciding that Wright's tent structure constituted "a house . . . or other building" under the terms of HRS § 803-37.

[14]  Keanaaina argues in passing that Wright "did not open the door for police entry." However, this court's precedent makes clear that a building occupant's reason for opening a door is irrelevant. See Dixon, 83 Hawai'i at 21, 924 P.2d at 189 (holding that officers need not demand entrance when using a ruse to persuade an occupant to open a door).

15

officers had to demand entrance.  Rather, <u>Harada</u> makes clear that a breaking only occurs when the force is "used to gain entry."  98 Hawaiʻi at 24, 41 P.3d at 180.

This distinction is particularly important where, as here, an officer's use of force to enter a building is merely incidental – and not necessary – to their entry.  For instance, in <u>Harada</u>, we held that officers had to demand entrance because "a breaking occurred when Officer Bermudes used force to prevent Harada from closing the door."  98 Hawaiʻi at 30, 41 P.3d at 186.  Similarly, we explained in <u>State v. Monay</u>, 85 Hawaiʻi 282, 283, 943 P.2d 908, 909 (1997), that an officer opening an apartment's closed, unlocked front door by using force to turn the door knob is required to demand entrance.  In both of these situations, the officers were only able to gain entry to the building at issue because of their use of force.

The record shows that Detective Hardie's use of force was incidental to his entry, and therefore did not constitute a breaking.  Notably, Detective Hardie could have entered the tent structure using the same opening Wright used as an exit.[15]

---

[15]    The dissent contends that because Wright moved a tarp to the side to exit the tent, this opening was "shut" to Detective Hardie.  This reasoning is flawed for two reasons.  First, as our double door example illustrates, the mere fact that an obstruction may be present does not render a structure shut.

Second, by the dissent's logic, if a person opens the entrance to a structure and leaves it open, the fact that the person opened the entrance door would obligate the officers to demand entry.  However, this court has

Detective Hardie's act of lifting a sheet of fabric consequently was not necessary to gain entry to the tent. Additionally, Keanaaina's own testimony indicated that Detective Hardie could have walked around the couch. Detective Hardie's movement of the couch was, in turn, unnecessary to gain entry.

In sum, HRS § 803-37's requirement that officers demand entrance to a shut building was not triggered because (1) Wright's tent structure was open and (2) Detective Hardie's uses of force therefore did not constitute "breakings" because the force was not necessary to gain entry.[16]

**3.    The officers nevertheless satisfied the objectives of HRS § 803-37's requirement to demand entrance.**

Despite the fact that HRS § 803-37 did not obligate the officers to demand entrance, Keanaaina proclaims that the purposes of the rule "were in fact frustrated." This is incorrect. The legislature enacted the "knock and announce" rule to: "(1) reduce the potential of violence to both occupants and police resulting from an unannounced entry; (2) prevent

---

already determined that such is not the case. See Dixon, 83 Hawai'i at 21, 924 P.2d at 189 (holding that officers need not demand entrance after an occupant opened the entry door).

[16]    Other courts have similarly held that an incidental use of force does not constitute a breaking. See, e.g., United States v. Thorne, 997 F.2d 1504, 1513 (D.C. Cir. 1993) (holding that no breaking occurred where "door was ajar" and officer "knocked twice and the force of the knocks further opened the door."); State v. Campana, 678 N.E.2d 626, 629 (Ohio App. 1996) ("the officers knocked and then walked into the workshop through an unlocked door that was ajar. In that they did not have to break down the door or break a window to effectuate the arrest, [the knock and announce statute] is inapplicable to this case.") (emphasis added).

unnecessary property damage; and (3) protect the occupant's right of privacy." Dixon, 83 Hawai'i at 14, 924 P.2d at 182; see also State v. Eleneki, 92 Hawai'i 562, 565, 993 P.2d 1191, 1194 (2000) ("Although the language of HRS §§ 803-11 and 803-37 differs, the purposes of the 'knock and announce rule' are identical in each context . . . ."). The officers' actions fulfilled each of these goals.

First, the officers reduced the potential of violence to both occupants and police by loudly announcing their presence and demanding that Wright and Keanaaina exit the tent structure. Although Keanaaina contends that "an unannounced entry had the potential of violence," the record proves otherwise. Detective Hardie looked into the tent from a large opening. From this vantage point, Detective Hardie saw that both Wright and Keanaaina were sleeping. Detective Hardie attempted to wake Wright and Keanaaina and to order both to exit the tent. If anything, these instructions reduced the potential of violence since the tent was a small, confined area where the occupants would be in close proximity to the officers and could have access to concealed weapons. Once Wright exited the tent structure, the only remaining occupant was Keanaaina, who continued sleeping. Under these circumstances, Detective Hardie's entrance into the tent after ordering the occupants to

exit did not create any potential of violence to either Detective Hardie or Keanaaina.

Second, Detective Hardie's entry into the tent did not create any risk of unnecessary property damage. Keanaaina insists that "moving a couch or opening a closed flap/barrier causes damages at least in the form of disrupting the living quarters." However, this argument disregards the knock and announce rule's purpose of preventing <u>unnecessary</u> property damage. <u>See</u> <u>Dixon</u>, 83 Hawai'i at 14, 924 P.2d at 182. Regardless, given that there was no potential for violence from Detective Hardie's entry, it was similarly unlikely that the entry would have led to any property damage.

Third, Detective Hardie acted with all due respect for Keanaaina's privacy. The officers began their announcements when they entered the tent encampment, at least fifteen feet away from Wright's tent structure. This gave Wright and Keanaaina some time to wake up and collect themselves before the officers arrived at Wright's tent structure. Additionally, Keanaaina had, at best, a limited expectation of privacy inside of the tent. <u>See</u> <u>State v. Kaaheena</u>, 59 Haw. 23, 28-29, 575 P.2d 462, 466-67 (1978) (explaining that there is no reasonable expectation of privacy when observations can be made from "a non-intrusive vantage point."). The record reveals that there was at least one large, pre-existing opening in the tent

structure that allowed passersby to look into the tent structure. Thus, Detective Hardie's observations through the opening did not intrude upon Keanaaina's privacy inside the tent structure. Kaaheena, 59 Haw. at 28-29, 575 P.2d at 466-67.

Detective Hardie also gave Keanaaina a reasonable period of time to respond before entering the tent. "[W]hat would constitute a reasonable period of time to respond to a knock and announcement must be determined by the circumstances of each case." Monay, 85 Hawai'i at 284, 943 P.2d at 910 (quoting State v. Garcia, 77 Hawai'i 461, 468, 887 P.2d 671, 678 (App. 1995)). Once Wright exited the tent, Detective Hardie continued trying to wake up Keanaaina from outside of the tent for a few minutes. Given that Detective Hardie could see that Keanaaina was non-responsive and knew that Keanaaina was hard of hearing, it appears that Detective Hardie waited a reasonable amount of time before entering the tent structure. Monay, 85 Hawai'i at 284, 943 P.2d at 910.

The officers' entry into Wright's tent structure consequently satisfied HRS § 803-37's purposes. Dixon, 83 Hawai'i at 15, 924 P.2d at 182; Eleneki, 92 Hawai'i at 565, 993 P.2d at 1194.

**B.    The search warrant authorized the officers to search Keanaaina's backpack.**

Keanaaina also claims that the ICA erred in ruling that the warrant authorized the officers to search Keanaaina's backpack. Keanaaina points out that the warrant authorized the officers to search items "found to be under the control of a female party identified as Michelle WRIGHT." However, Keanaaina argues that Wright "could not have been in control of the backpack" because she was not in the tent next to the backpack at the time it was seized by the officers. Keanaaina further asserts that the officers had notice that the backpack was Keanaaina's – not Wright's – because it "was found next to [Keanaaina] on a bed where he was sleeping and the police identified the [leopard-print] backpack as belonging to Michelle Wright." These arguments are unavailing.

First, Keanaaina's insistence that Wright had to be in the tent to control the backpack – and thereby bring the backpack within the warrant's ambit – is nonsensical. By Keanaaina's reasoning, Wright lost control over all objects in the tent the moment she walked out. A defendant may not so easily evade a lawful search of their possessions. Black's Law Dictionary 416 (11th ed. 2019) defines "control" as "[t]he direct or indirect power to govern the management" of an object. (Emphasis added.) It also defines the act of control as "[t]o

exercise power or influence over." Id. These definitions indicate that a person may "control" an object without actual physical possession of or proximity to the item.

Our precedent regarding possession confirms this. For instance, a person may exercise actual possession, meaning that she "has direct physical control over a thing at a given time." State v. Jenkins, 93 Hawai'i 87, 110, 997 P.2d 13, 36 (2000). Alternatively, this person may exercise constructive possession, where she possesses "both the power and the intention at a given time to exercise dominion over [the] thing, either directly or through another person or persons." Id. Thus, Wright could still have possessed and controlled the gray backpack without actually being inside of the tent, and the officers were therefore not precluded from searching the gray backpack.

Second, the officers lacked sufficient notice to determine that Keanaaina owned the backpack. Keanaaina claims that the facts that his "gray camo backpack was found next to him . . . and [that] the police identified the [leopard-print] backpack as belonging to Michelle Wright" were sufficient to notify the officers that Keanaaina had "some sort of ownership of the backpack." This court's decision in Nabarro leads us to a different conclusion. See 55 Haw. 583, 525 P.2d 573.

There, officers conducted a search of a hotel room pursuant to a warrant identifying two male occupants. Id. at

22

583-84, 525 P.2d at 574. During the search, Nabarro, who was a female visitor in the room, grabbed her purse before attempting to enter the bathroom. Id. The officers searched Nabarro's purse and found marijuana and paraphernalia. Id. at 584, 525 P.2d at 574-75. This court held that the evidence found in Nabarro's purse should have been suppressed because "there was no question that the police had notice, prior to the search, that Miss Nabarro . . . was the owner of the purse." Id. at 588, 585 P.2d at 577. This conclusion was based upon the facts that (1) the warrant identified two males as the occupants of the room, making it unlikely that the purse belonged to either of the warrant's targets; (2) the purse was in Miss Nabarro's immediate vicinity; and (3) Miss Nabarro picked up the purse "in circumstances that made it highly unlikely that the purse belonged to anyone else." Id.

None of these factors are present here. First, it is unreasonable for Keanaaina to imply that Wright could only possess one backpack. It is plausible that, as a person without permanent housing, Wright owned multiple backpacks to keep her possessions easily mobile. Indeed, the warrant recognized as much when it authorized the search of "backpacks." Furthermore, the backpack's gray coloration did not provide notice that the bag did not belong to Wright. Nothing prevents a woman from

23

owning both a leopard-print backpack and a dark-colored backpack.

Second, the fact that the bag was in close proximity to Keanaaina also did not provide notice that the backpack belonged to Keanaaina.  As a preliminary matter, we clarify that Nabarro's identification that the purse was in Nabarro's immediate vicinity must be considered in the context that purses are "characteristically female attire."[17]  See id. at 588, 525 P.2d at 577.  No similar context clues existed here.  Nothing about the backpack's color indicated that it belonged to Keanaaina.  Furthermore, the officers only knew that Keanaaina might be in Wright's tent.  The officers therefore could have fairly assumed that the items in the tent belonged to Wright regardless of their proximity to Keanaaina.

Lastly, Keanaaina did not take any action that indicated that the gray backpack was his.  Keanaaina did not testify that he described his bag to the officers.  At most, he

---

[17]    There would be significant issues in relying on proximity alone as a dispositive factor.  As this court explained in Nabarro, placing a visitor's possible possessions beyond the reach of a search warrant would render effective execution impossible "since the police could never be sure that a plausible repository for items named in the warrant belongs to a resident, and hence is searchable, or to a non-resident, and hence is not searchable." Id. at 587-88, 525 P.2d at 576-77.
     Keanaaina's proposed use of proximity as a dispositive factor would lead to an even more untenable circumstance than the one this court sought to avoid in Nabarro.  Instead of merely preventing police from searching items that clearly belong to a visitor, Keanaaina suggests that police should not be able to search items that are near a known visitor.  This would have rendered the execution of the search warrant impossible by preventing the officers from searching any items or places near Keanaaina.  Contra id. at 587-88, 525 P.2d at 576-77.

asked Detective Hardie "where's my backpack?" Although this inquiry would have indicated that Keanaaina may have owned a backpack in the tent, it was not sufficient to inform the officers that Keanaaina owned the gray backpack.

Under these circumstances, the officers did not have notice that Keanaaina was the owner of the backpack, and were therefore entitled to assume that the backpack was subject to search under the warrant. See id. at 588, 525 P.2d at 577 ("without notice of some sort of ownership of a belonging, the police are entitled to assume that all objects within premises lawfully subject to search under a warrant are part of those premises for the purpose of executing the warrant.").

## IV. CONCLUSION

For the foregoing reasons, we affirm the ICA's June 5, 2020 Judgment on Appeal, which affirmed the circuit court's November 17, 2017 Judgment of Conviction and Sentence.

Victor M. Cox for
for petitioner

Stephen L. Frye
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Jeffrey P. Crabtree

